## In re ESTATE OF Helen B. PRICE.

Court of Appeals of Tennessee,
Eastern Section, at Knoxville.

Oct. 24, 2007 Session.

March 24, 2008.

Application for Permission to Appeal
Denied by Supreme Court
Sept. 29, 2008.

John K. Banks, Elizabethton, Tennessee, for the Appellants, William G. Fenner, Sr., William G. Fenner, Jr., Terry Wayne Fenner, Kathy Fenner Melton, Connie Fenner Gray, Willie Jo Perry, Chucky Price, David Price, Chris Price, and Kathy Price Lyon.

Robert J. Jessee, Johnson City, Tennessee, for the Appellee, Helen Sue Ludrosky.

## OPINION

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, J., joined.

Decedent died testate, leaving her entire estate to her sole surviving child, and leaving nothing to the man she had lived with for more than forty years, William G. Fenner, Sr. Mr. Fenner and all but one of decedent's grandchildren filed an action to invalidate the will on the basis of undue influence and lack of testamentary capacity. In the alternative, plaintiffs alleged that decedent and Mr. Fenner were partners and her assets were assets of the partnership, to which he is entitled to half. Plaintiffs also requested that the Trial Court impose a trust upon decedent's estate for the benefit and use of Mr. Fenner. Following two hearings on these issues, the Trial Court dismissed all of plaintiffs' claims and upheld the validity of decedent's will. Plaintiffs appeal, raising issues regarding undue influence, testamentary capacity, implied partnership, imposition of a resulting trust, defendant's failure to testify at the second hearing, and the Trial Court's dismissal of portions of plaintiffs' claims pursuant to Tenn. R. Civ. P. 41.02 motions by defendant. We find no error on the part of the Trial Court, and, therefore, affirm.

### I. Background

This is an action to contest the validity of a will and to recover property allegedly held by the decedent as partnership assets. Ms. Price died on September 7, 2005, at the age of 83. Before we discuss the circumstances surrounding the execution of Ms. Price's will, it will be helpful to summarize Ms. Price's family situation.

Ms. Price was the mother of four children, three of whom predeceased her. Barbara Joan Price Fenner Summerow died in 2001, leaving five children: William G. Fenner, Jr., Terry Fenner, Kathy Fenner Melton, Connie Fenner Gray, and Willie Jo Perry. Charles Price died in 1967 and was survived by his four children: Chucky Price, Charles David Price, Kathy Price Lyon, and Chris Price. Joe Bob Price died in 1966, leaving one son, Charles Dean Price.[1] Ms. Price's sole surviving child is Helen Sue Ludrosky ("Ms. Ludrosky" or "Defendant").

Ms. Price's daughter, Ms. Summerow, was married to the plaintiff, William G. Fenner, Sr. ("Mr. Fenner"). They divorced in 1966, and Mr. Fenner was awarded custody of the parties' four children. Later that year, Mr. Fenner moved in with Ms. Price and her youngest daughter, Ms. Ludrosky, who was born in 1956. Mr. Fenner and Ms. Price began living together so that Ms. Price could assist Mr. Fenner in raising his children, Ms. Price's grandchildren. The couple also raised Ms. Summerow's fifth child, Willie Jo Perry, who was born four years after Ms. Summerow's divorce from Mr. Fenner. Years later, Ms. Price and Mr. Fenner also took care of Ms. Ludrosky's two children, Martha Reyes and Joey Lowman.

During her relationship with Mr. Fenner, Ms. Price was a stay-at-home mother. Mr. Fenner provided for their family by installing and refinishing bowling lanes. Mr. Fenner traveled across the United States and to other countries performing his work, earning between $200,000 and

---

1. Charles Dean Price is listed as a defendant in this lawsuit. However, the record reflects that his relatives do not know how to contact him, have not heard from him in several years, and do not even know if he is still alive. Therefore, we shall refer to only Ms. Ludrosky as "Defendant" because Charles Dean Price does not appear to have participated in this lawsuit at all.

$400,000 some years. Shortly after Ms. Price and Mr. Fenner began cohabiting, they purchased property on State Line Road in Elizabethton ("the State Line Road Property"). Over the next five years, Mr. Fenner constructed a house on the property, and the couple and the children moved to the new residence in 1972. Later, Mr. Fenner and Ms. Price purchased an adjacent lot upon which Mr. Fenner built a warehouse for use in his bowling alley refinishing business. The couple also owned property on Birch Street in Elizabethton ("the Birch Street Property"), which was purchased by Ms. Price and Mr. Fenner as tenants in common. In the mid–1980s, Mr. Fenner executed warranty deeds conveying his one-half interest in the State Line Road and Birch Street properties to Ms. Price. The couple purchased and then sold several other properties, but the only two real properties in the estate at the time of Ms. Price's death were the State Line Road Property and the Birch Street Property.

On June 7, 2005, Ms. Price executed a will devising all of her belongings to her daughter, Ms. Ludrosky, and leaving nothing to Mr. Fenner. Ms. Ludrosky assisted her mother in finding an attorney to draft the will. Ms. Ludrosky was present with Ms. Price at the attorney's office when the "Last Will and Testament of Helen B. Price" ("the Will") was drafted and executed. During the same attorney visit, Ms. Price executed two powers of attorney naming Ms. Ludrosky as her attorney-in-fact for general and health care matters. Mr. Fenner and the rest of Ms. Price's family were unaware of the Will. Later that same day, Ms. Price was admitted to the hospital. She underwent open heart surgery approximately one week later.

After staying at a nursing home for three weeks to recover from the operation, Ms. Price stayed at Ms. Ludrosky's home for two weeks and then returned to her house on State Line Road. Ms. Price died on September 7, 2005, from complications resulting from a broken hip sustained during a fall.

Three weeks after Ms. Price's death, Ms. Ludrosky filed a petition to admit the Will to probate in the Chancery Court of Carter County, Tennessee ("the Trial Court"). The Trial Court entered an order admitting the Will to probate and appointing Ms. Ludrosky executrix of Ms. Price's estate, in accordance with the terms of the Will.

Approximately one week later, the attorney for the Estate of Helen B. Price ("the Estate") mailed a letter to Mr. Fenner directing him to vacate the State Line Road Property where he and Ms. Price had lived. The letter further stated that Mr. Fenner could move into the house on the Birch Street Property.

On October 20, 2005, Mr. Fenner and all but one of Ms. Price's grandchildren (collectively "Plaintiffs")[2] filed a Complaint to Set Aside Last Will and Testament and to Declare Ownership of Assets ("the Complaint"). Plaintiffs alleged that Ms. Price was not competent to execute the Will on June 7, 2005, and that Ms. Ludrosky unduly influenced Ms. Price to make the Will with Ms. Ludrosky as the sole beneficiary. Plaintiffs also asserted that:

> Helen B. Price held all assets titled in her name in trust for the use and benefit of William G. Fenner, Sr., and Helen B. Price, that William G. Fenner, Sr., is the equitable owner of all of the assets titled in the name of Helen B. Price, that

---

2. Plaintiffs are Mr. Fenner, William G. Fenner, Jr., Terry Wayne Fenner, Kathy Fenner Melton, Connie Fenner Gray, Willie Jo Perry,

Chucky Price, David Price, Chris Price, and Kathy Price Lyon. The only grandchild who is not a plaintiff is Charles Dean Price.

William G. Fenner should be awarded legal title to same, that Helen Sue Ludrosky has contributed nothing to the acquisition of these assets and that Helen Sue Ludrosky will be unjustly enriched if these assets are held to be assets of the Estate of Helen B. Price. In the alternative, Plaintiffs alleged that a partnership existed between Ms. Price and Mr. Fenner and that "all assets titled in the name of Helen B. Price are partnership assets."

Ms. Price's plaintiff grandchildren assigned their interest in Ms. Price's estate to Mr. Fenner, as stated in the Complaint:

All of the other Plaintiffs acknowledge that William G. Fenner, Sr., is entitled to all of the right, title and interest of all the real and personal property titled in the name of Helen B. Price and to all the assets of her Estate, and said Plaintiffs hereby assign all of their right, title and interest in and to same to William G. Fenner, Sr.

The Trial Court bifurcated the trial on the issues raised by Plaintiffs. On March 29 and 30, 2006, the Trial Court heard evidence regarding Ms. Price's competency to execute the Will and the alleged undue influence exerted by Ms. Ludrosky in persuading Ms. Price to devise her Estate to Ms. Ludrosky. At the close of Plaintiffs' proof, Ms. Ludrosky moved for involuntary dismissal of Plaintiffs' competency and undue influence claims pursuant to Tenn. R. Civ. P. 41.02.[3] The Trial Court granted Ms. Ludrosky's motion as to the undue influence claim and denied the motion on the issue of Ms. Price's competency to execute her Will. After hearing Ms. Ludrosky's evidence, the Trial Court ruled that Ms. Price was competent to execute her Will on June 7, 2005, and upheld the validity of the Will.

The second hearing was held on January 22 and 23, 2007, regarding the partnership and trust issues. At the close of Plaintiffs' proof, Ms. Ludrosky again moved for a directed verdict on all issues. The Trial Court granted a directed verdict for Ms. Ludrosky on the partnership issue, finding that Plaintiffs had failed to prove an implied partnership between Ms. Price and Mr. Fenner. The Trial Court reserved ruling on the trust issue until the close of all proof. After all the proof was presented, the Trial Court held that Plaintiffs had not met their necessary burden to show that an equitable trust in favor of Mr. Fenner should be found and dismissed Plaintiffs' Complaint. The Trial Court also found that Mr. Fenner owned the equipment and supplies from his bowling-lane business. Plaintiffs appeal.

## II. Discussion

Plaintiffs present six issues for our review, which we restate as follows:

1. Whether the Trial Court erred by finding that the "Last Will and Testament of Helen B. Price" executed on June 7, 2005, was not invalid because of ·undue influence by Ms. Ludrosky in procuring Ms. Price's execution of this document.

2. Whether the Trial Court erred by finding that Ms. Price was competent to execute her will on June 7, 2005.

3. Whether the Trial Court erred by not taking into consideration Ms. Ludrosky's failure to testify at the second hearing.

---

**3.** Rule 41.02 provides in pertinent part: "After the plaintiff, in an action tried by the court without a jury, has completed the presentation of plaintiff's evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief." Tenn. R. Civ. P. 41.02(2).

4. Whether the Trial Court erred by finding that no partnership existed between Mr. Fenner and Ms. Price and that Mr. Fenner did not have a partnership interest in property titled in the name of and/or possessed by Ms. Price.

5. Whether the Trial Court erred by not imposing a trust upon assets titled in Ms. Price's name for the use and benefit of Mr. Fenner, and whether the Trial Court erred in finding that Ms. Ludrosky would not be unjustly enriched by retaining the assets titled in Ms. Price's name.

6. Whether the Trial Court erred in granting Defendant's motions of involuntary dismissal pursuant to Tenn. R. Civ. P. 41.02 on the issues of partnership and undue influence.

In a non-jury case such as this one, we review the record *de novo* with a presumption of correctness as to the trial court's determination of facts, and we must honor those findings unless there is evidence which preponderates to the contrary. Tenn. R.App. P. 13(d); *Bogan v. Bogan,* 60 S.W.3d 721, 727 (Tenn.2001). When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings. *Seals v. England/Corsair Upholstery Mfg. Co., Inc.,* 984 S.W.2d 912, 915 (Tenn.1999). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.,* 58 S.W.3d 706, 710 (Tenn.2001).

## A. Undue Influence

Plaintiffs alleged that the Will was invalid because Ms. Ludrosky exerted undue influence upon Ms. Price regarding the distribution of her Estate. The Trial Court granted Defendant's Rule 41.02 motion on this issue at the close of Plaintiffs' proof. Therefore, in reviewing the Trial Court's ruling on this issue, we will consider only the evidence presented by Plaintiffs during the first hearing.[4]

Every witness who testified for Plaintiffs agreed that Ms. Price was an independent person who made her own decisions. Frances Robert Hensley, Ms. Price's niece, stated, "Helen [Price] was the type of person, she said exactly what she thought. If you had done something she didn't like, she told you."[5]

Several witnesses also testified to Mr. Fenner's excellent reputation for truthfulness in his community. Ms. Hensley stated she had never known Mr. Fenner to lie about anything, and "[i]f he couldn't do anything to help you, he certainly would never do nothing to hurt you."

Ms. Price did not work outside the home during her relationship with Mr. Fenner. Instead, she stayed at home and raised Mr. Fenner's children and a number of other young relatives. Many witnesses testified that Ms. Price went almost everywhere with Mr. Fenner, and that she even helped drive trucks hauling materials to and from Mr. Fenner's work sites before her health declined in the last years of her

---

4. In their appellate brief, Plaintiffs rely on evidence presented by Defendant as support for their arguments against the Trial Court's judgment on the issue of undue influence. However, the Trial Court granted a directed verdict on this issue before Defendant presented her proof. In reviewing the Trial Court's decision on this issue, we are constrained to consider only the evidence that was presented to the Trial Court before its ruling-i.e., Plaintiffs' proof.

5. Although Ms. Price and Ms. Ludrosky have the same first name, the record reflects that Ms. Price was referred to as "Helen" and Ms. Ludrosky was called by her middle name as either "Sue" or "Susie."

life. Ms. Price received Social Security benefits which were used to pay her supplemental health insurance. As a result, Mr. Fenner was the primary breadwinner in the home. Several witnesses testified that Ms. Price handled the couple's finances using the money Mr. Fenner sent her while he was working away from home.

Although Ms. Price and Mr. Fenner never married, Mr. Fenner testified that he felt that Ms. Price was entitled to half of everything he earned, stating as follows:

> Well, when we started living together, you know, and Helen was raising my children, she had give up her life and everything and I figured that the best thing to do would be just anything that we accumulated just be in mine and hers, both, names. And that's what everything we accumulated was.

Ms. Price and Mr. Fenner executed mutual wills in 1966, leaving all of their property and possessions to each other.[6] Mr. Fenner stated that he and Ms. Price executed a joint will in 1970, leaving their estates to each other or, in the event of simultaneous death, to their children. However, that will could not be found after Ms. Price's death.[7]

Mr. Fenner testified that everything the couple accumulated was titled in both his and Ms. Price's name. However, he stated that he deeded his interest in their real property to Ms. Price after he paid off an IRS lien:

> Well, I got in trouble with the IRS, owed them some money, you know; and they put a lien on the properties. And I finally got the properties, you know, the lien paid off. And then I had the thing made over in Helen's name so the IRS couldn't tie it up again.

Both the Birch Street and State Line Road Properties were deeded to Ms. Price as a result of Mr. Fenner's tax difficulties, and Ms. Price never conveyed any interest in these properties back to him. Mr. Fenner said that Ms. Price had offered to reconvey the property so that the deeds would be in both of their names again, but Mr. Fenner said he trusted Ms. Price and "didn't see no reason" to have the deeds changed. He also thought that their joint will was still in effect and the property would revert to him if Ms. Price died.

Mr. Fenner testified that Ms. Price's mental condition deteriorated during the last years of her life. He stated that she often couldn't remember what day it was. Mr. Fenner said that at times during 2005, Ms. Price would hear young children laughing in the hallway when there were no children in the house. Also, twice in late 2004 or early 2005, Ms. Price pointed out a man outside the post office and told Mr. Fenner that the man was a "psychic vampire" who was draining her psychic powers.

Ruth Whitaker, a niece of Ms. Price, testified that Ms. Price told her that her house was haunted. Ms. Price described to Ms. Whitaker seeing a ghost that looked like Abraham Lincoln. Ms. Farmer likewise testified that three or four years ago, Ms. Price had talked about an invisible man in her house that talked to her when no one else was home, and no one could see him but Ms. Price. Ms. Perry also testified that in the summer of 2005, Ms. Price heard a man's voice talking to her when Ms. Perry was present and did not hear any such voice.

---

6. A copy of Ms. Price's 1966 will is included in the record.

7. Other witnesses confirmed the existence of such a will, even though the actual document was not admitted into evidence.

Kathy Regina Melton, Mr. Fenner's daughter and Ms. Price's granddaughter, testified that during 2005, Ms. Price had trouble paying bills correctly, stating, "[S]he would get mixed up and send the light bill to the Water Department and she would send one of the gas cards to Penney's or vice versa, you know. I'm just-I don't recall the exact ones, but she would get her credit cards mixed up. And she owed a lot on credit cards, and it bothered her."[8]

Willie Jo Fenner Perry, who works as a nurse in an Alzheimer's disease unit at a local nursing home, described changes in Ms. Price's mental health that she noticed during the last several years of Ms. Price's life:

A. For the last five years she progressively started showing signs of early stages of Alzheimer's. She had episodes of delusions, as well as hallucinations, which is symptoms of Alzheimer's. She had loss of initiative.

* * *

Q. What do you mean by that?

A. Her daily living changed from what she ordinarily did. She went to just laying all the time, wanting to sleep all the time, wanting-she had no initiative to get out of the house much. There was a big change in her personality.

Q. And describe that, please, if you would.

A. She was very moody. She was once a very vibrant, lively woman that enjoyed life. And she, the last year of her life, became very drawn in. She was not—she had no desire to go out in public and meet people or socialize. She was just very drawn into the home.

Q. Was that a . . . big change?

A. Yes, it was.

Ms. Perry also stated that by the time of Ms. Price's June 2005 surgery, Ms. Price would have been easily influenced into making decisions.

Mr. Fenner testified that Ms. Price was convinced that he brought a woman back from Scotland with him when he went there to work approximately ten years ago, though he repeatedly denied having done so. Mr. Fenner stated that Ms. Price believed that the woman would drive up and down the road in front of their house, revving her car engine and blowing the horn. He added that Ms. Price even stated that the woman had shot at their house two or three times. Mr. Fenner never heard gunshots and saw no evidence to indicate gunfire. "And I would have to take her out the next morning," he said, "and show her that there wasn't no bullet holes or, you know, bricks chipped or something."

Several other witnesses testified about Ms. Price's apparent obsession with the so-called "woman from Scotland."

Ms. Perry said Ms. Price's allegations about the woman from Scotland began in 1996 when they picked Mr. Fenner up at the airport upon his returning from a several months long work trip to Scotland. Ms. Perry said that Ms. Price had difficulty reaching Mr. Fenner while he was on that trip, and this may have "initiated some suspicions." Ms. Perry said that Ms. Price asked her if she had seen anything unusual at the airport, because Ms. Price had "seen a blonde woman coming up behind [Mr. Fenner] and he acted like he

---

8. Ms. Melton attributed Ms. Price's credit card debt to the fact that Ms. Price often would buy meals and presents for family members, and that she also purchased a lot of clothing for herself that she never wore. Ms. Melton also stated that Mr. Fenner worked hard to pay down the credit cards "so she could sleep at night."

was in a hurry to get out of the airport terminal."

Mary Ann Clark, the wife of Ms. Price's deceased son, Charles Price, testified that in early 2004, Ms. Price once asked her to follow a white car to Wal–Mart as Mrs. Price believed the driver was the woman from Scotland. She did so, but when the driver got out of the car, it was a man. During this incident, Ms. Clark also stated that Ms. Price told her that she had a gun and that "she could kill anybody and get by with it because she had checked herself into the crazy house once before."

Ms. Perry recalled an incident when Ms. Price thought the woman from Scotland was following them in a Grindstaff Chevrolet service van. Ms. Perry said when she turned around to look at the blonde driver of the van, Ms. Perry recognized her as a woman named "Amy" who was a couple of years older than Ms. Perry. When Ms. Perry identified the woman and told Ms. Price that she was wrong, Ms. Perry said her grandmother got angry and then "became paranoid towards me, thinking that I was hiding the secret."

Harold Dean Matherly,[9] Mr. Fenner's nephew, testified that in the last year or two of Ms. Price's life, her mind "had deteriorated to a point that she didn't know what she was doing part of the time." He said Ms. Price "started talking out of her head" about the woman from Scotland, even accusing Mr. Matherly of hiding the woman at his house. Mr. Matherly also stated that:

Susie [Ludrosky] brought that to my attention telling me that her mother was crazy and she was going to have to have her committed. And I knew that Helen [Price] was such a strong-willed person,

that Susie didn't have the ability to do that because she's just not as strong-willed as her mother was.

Connie Sue Fenner Gray, one of Mr. Fenner's children, testified that one night in early January of 2005, while Ms. Price was having a fit about the woman from Scotland, Ms. Ludrosky threatened to put Ms. Price in a "nut house" if she didn't settle down. Ms. Gray continued:

Mama shook her finger at her and told her, "If you know what's good for you, you won't do it." And then she looked at me and asked me if I believed her. And when I said I didn't, she told me to leave and not come back. And I stayed away for about three months. And during that time suddenly Susie became her prized daughter.

According to Mr. Fenner, Ms. Ludrosky only visited Ms. Price about once every seven or eight weeks. However, he admitted that if Ms. Ludrosky visited while he was working out of town and Ms. Price did not mention it to him, then he would not have known of her visit. Mr. Fenner said that his daughter, Ms. Gray, was the one who normally looked after Ms. Price while Mr. Fenner was working away from home. However, he admitted that Ms. Ludrosky was the one who made arrangements for Ms. Price while she was in the hospital and nursing home following her open-heart surgery in 2005. Mr. Fenner stated he was out of town when Ms. Price was admitted to the hospital but returned before her surgery. He left town for a job about two weeks after Ms. Price's surgery, while she was still in the hospital, and did not return until a week or two after she was released from the nursing home. Ms.

9. Mr. Matherly testified that Ms. Price sent him to the penitentiary when he was eighteen because he broke into her home and stole Green Stamps from her. Mr. Matherly testified that after he served his sentence, he and Mrs. Price made their peace, and Mr. Matherly began saving Green Stamps to give back to Ms. Price.

Price stayed with Ms. Ludrosky for approximately two weeks until Mr. Fenner returned.

Mr. Fenner testified that Ms. Ludrosky made numerous statements during the last four or five years of Ms. Price's life regarding the possibility of committing Ms. Price to a mental institution. According to Mr. Fenner, Ms. Ludrosky "[s]aid that she had seen an attorney and they could not admit [Ms. Price] to a crazy house if one person got up and swore that she was sane. And [Ms. Ludrosky] said she didn't know what she was going to do."

Although Mr. Fenner testified to Ms. Price's decreased mental capacity in . the last five years of her life, he never attempted to get her to see a psychiatrist, psychologist, or counselor. In explanation, Mr. Fenner said, "Well, you know, we wasn't married and I thought about that, and Sue [Ludrosky] was the one supposed to take care of that; she was her daughter. If I would have took her to a psychiatrist or something, they wouldn't even talk to me because I wasn't no kin to her."

Although several witnesses testified that Ms. Price's mental condition had been deteriorating for a number of years, others did not notice any problems until a few months before her death.

Nancy Brown, Mr. Fenner's niece, testified that she first observed a difference in Ms. Price's mental condition when she visited Ms. Price after Ms. Price's heart surgery in 2005. Ms. Brown stated that during those visits, Ms. Price was unfriendly and "not herself at all." However, Ms. Brown admitted that Ms. Price always recognized her and knew who she was.

Ms. Clark testified that she brought her granddaughter with her to visit Ms. Price at the nursing home following Ms. Price's heart surgery. Ms. Price did not recognize Ms. Clark's granddaughter, even though Ms. Price had seen her often. However, Ms. Price did recognize Ms. Clark and called her by name.

Chris Brown Price, Ms. Price's grandson, testified that he saw Ms. Price in the parking lot of a relative's house two or three weeks after her surgery in 2005, and he said that Ms. Price didn't seem to recognize him. However, he admitted that he hadn't visited Ms. Price in four or five years before her surgery.

Charles David Price, another grandson of Ms. Price, testified that he saw Ms. Price on the same date as did his brother, Chris Brown Price, following Ms. Price's surgery. He said that he assumed that Ms. Price recognized him when they talked, but that "she really didn't have much to say." He said that she did not look well, and she did not remember that he had had a son in 2004, even though she had seen the child the previous year.

On cross-examination, Chris Brown Price and Charles David Price admitted they had been convicted of various criminal offenses. Both men also testified that they were not close to their grandmother.

One of Ms. Price's physicians also testified that she was mentally ill. Dr. David Fenner, Mr. Fenner's brother, practices internal medicine in Elizabethton, and Ms. Price was one of his patients. Dr. Fenner testified that he saw Ms. Price on March 28, 2005, for a follow-up after Ms. Price had been hospitalized for congestive heart failure. As a result of that appointment, Dr. Fenner said that he was concerned about Ms. Price's mental condition because she talked only briefly about her physical problems before discussing her belief that Mr. Fenner had brought a woman back from Scotland with him and had fathered a child with that woman.

Dr. Fenner testified that the next time he saw Ms. Price was on August 2, 2005,

and Ms. Price talked about the Scotland woman again during this visit. Dr. Fenner stated that in his professional opinion, Ms. Price was schizophrenic and was having both delusions and hallucinations. He stated that Ms. Price's mental condition would give him concern about her ability to go through the process of making a will. Dr. Fenner also stated that "[p]eople with schizophrenia certainly can come across at times as being totally rational," and that other doctors who examined her for brief periods of time might not notice signs of schizophrenia.

On cross-examination, Dr. Fenner admitted that he had not made a notation in Ms. Price's medical chart that she was having hallucinations and delusions or that she was schizophrenic. Dr. Fenner explained the absence of any record of his alleged diagnosis by stating that in his opinion, Ms. Price would not have gotten help even if he had recommended it.

Dr. Fenner stated that he made no effort to notify any of Ms. Price's other doctors about her mental condition. Dr. Fenner admitted that during her appointment, Ms. Price knew who he was and gave an accurate physical history. He said that he did not think there was anything in Ms. Price's medical record to indicate that she had a mental illness. Ms. Price was his patient since approximately 1996.

Dr. Fenner signed Ms. Price's death certificate, which stated that she died from complications of a hip fracture. However, neither did Dr. Fenner personally examine Ms. Price while she was hospitalized or following her death, nor did he see a medical report about how Ms. Price fractured her hip or what complications developed. Dr. Fenner admitted he did not even know who treated Ms. Price. When asked how he could sign Ms. Price's death certificate when he had no personal knowledge of the circumstances surrounding her death, Dr. Fenner stated that "[w]e frequently sign off on death certificates without ever having seen the patient because just from our history of having either known the person for a long time."

After hearing Plaintiffs' proof, the Trial Court found that Ms. Ludrosky did not exercise undue influence over Ms. Price in the execution of the Will and granted a Rule 41.02 motion for involuntary dismissal in favor of Defendant. Our Supreme Court has set forth the following standard of review when a trial court grants a dismissal pursuant to Tenn. R. Civ. P. 41.02:

> When a motion to dismiss is made at the close of a plaintiff's proof in a non-jury case [under Rule 41.02], the trial court must impartially weigh the evidence as though it were making findings of fact and conclusions of law after all the evidence has been presented. *See City of Columbia v. C.F.W. Constr. Co.*, 557 S.W.2d 734, 740 (Tenn.1977). If a plaintiff's case has not been established by a preponderance of the evidence, then the case should be dismissed if the plaintiff has shown no right to relief on the facts found and the applicable law. *Id.; Atkins v. Kirkpatrick*, 823 S.W.2d 547, 552 (Tenn.Ct.App.1991). The standard of review of a trial court's decision to grant a Rule 41.02 involuntary dismissal is governed by Rule 13(d) of the Tennessee Rules of Appellate Procedure. *Atkins*, 823 S.W.2d at 552.

*Bldg. Materials Corp. v. Britt*, 211 S.W.3d 706, 711 (Tenn.2007). Therefore, we review the record *de novo* with a presumption of correctness as to the trial court's determination of facts, and we must honor those findings unless there is evidence which preponderates to the contrary. Tenn. R.App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn.2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of

correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn.2001).

Courts apply the doctrine of undue influence "when one party, such as a grantee, is in a position to exercise undue influence over the mind and the will of another, such as a grantor, due to the existence of a confidential relationship." *Brown v. Weik*, 725 S.W.2d 938, 945 (Tenn. Ct.App.1983). In *Iacometti v. Frassinelli*, we discussed the nature of a confidential relationship as follows:

> It. is that relationship where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with the ability, because of that confidence, to influence and exercise dominion over the weaker or dominated party, such as nurse and invalid, trusted business adviser and friend etc. *Bayliss v. Williams* (1869) 6 Cold. 440, 46 Tenn. 440; *Miller v. Proctor*, [24 Tenn.App. 439, 145 S.W.2d 807] *supra*. Proof of the existence of the normal family relationship between a parent and adult child, standing alone, does not give rise to an inference or presumption that either one exercises any dominion and control over the other.

*Iacometti v. Frassinelli*, 494 S.W.2d 496, 499 (Tenn.Ct.App.1973). A trial court's conclusions regarding whether a confidential relationship existed or a person exercised undue influence over another are questions of fact. *Gibson v. Gibson*, No. W2004–00005–COA–R3–CV, 2004 WL 2464271, at \*3 (Tenn.Ct.App.W.S., Nov. 2, 2004).

In Tennessee, a presumption of undue influence arises when there is a confidential relationship followed ·by a transaction in which the dominant party receives a benefit from the other party. *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn.1995). The burden of proof for these elements rests with the party who alleges the confidential relationship. *Smith v. Smith*, 102 S.W.3d 648, 653 (Tenn.Ct.App.2002). However, once that party establishes a presumption of undue influence, the burden of proof shifts to the dominant party to rebut the presumption by clear and convincing evidence of the fairness of the transaction. *Id.*

Plaintiffs maintain that the Trial Court should have found that Ms. Ludrosky exercised undue influence over Ms. Price in the execution of her Will because: 1) as Ms. Price's attorney-in-fact, Ms. Ludrosky had a confidential relationship with Ms. Price; 2) as the sole beneficiary of Ms. Price's Will, Ms. Ludrosky clearly received a benefit from Ms. Price; and 3) there was not clear and convincing evidence of the fairness of the transaction.

Generally, a confidential relationship arises when a dominant party is granted an unrestricted power of attorney. *Childress*, 74 S.W.3d at 328–29 (citing *Matlock v. Simpson*, 902 S.W.2d at 386). However, there are exceptions to this rule. In *Childress v. Currie*, our Supreme Court held that "an unexercised power of attorney does not in and of itself create a confidential relationship." *Id.* at 329. The High Court explained its reasoning as follows: "When an unrestricted power of attorney is executed but has not yet been exercised, good sense dictates that there exists no dominion and control and therefore no confidential relationship based solely on the existence of the power of attorney." *Id.* We have adhered to the precedent announced in *Childress* in deciding subsequent cases. *See, e.g., Basham v. Duffer*, 238 S.W.3d 304, 313 (Tenn.Ct.App. 2007) ("Therefore, Diane's failure to execute any transactions as power of attorney results in the absence of the confidential relationship presumption, and thereby re-

leases her from liability as to this matter. James exercised his status as Ray's power of attorney, placing the burden on him to prove by clear and convincing evidence that any of the transactions were fair to Ray."); *Parish v. Kemp,* 179 S.W.3d 524, 532 (Tenn.Ct.App.2005) (finding a confidential relationship existed where appellees had exercised the powers of attorney granted to them by decedent).

The parties do not dispute that Ms. Price granted an unrestricted power of attorney to Ms. Ludrosky on the same day Ms. Price signed the Will. However, Plaintiffs presented no evidence that Ms. Ludrosky ever exercised the power of attorney. Therefore, Plaintiffs' claim that a confidential relationship existed on the basis of the power of attorney granted to Ms. Ludrosky must fail.

We have previously stated that "the doctrine of undue influence is applicable only where there is a confidential relationship with the testator whereby one party is able to dominate and exercise undue influence over the testator." *In re Estate of Brevard,* 213 S.W.3d 298, 302 (Tenn.Ct.App. 2006) (citing *Keasler v. Estate of Keasler,* 973 S.W.2d 213, 219 (Tenn.Ct.App.1997); *Simmons v. Foster,* 622 S.W.2d 838, 840 (Tenn.Ct.App.1981)) (internal footnotes omitted). Aside from their argument regarding the powers of attorney executed by Ms. Price, Plaintiffs did not present any other basis for a confidential relationship between Ms. Price and Ms. Ludrosky.[10] As found by the Trial Court, Plaintiffs failed to introduce sufficient proof that Ms. Ludrosky dominated Ms. Price to the extent that a confidential relationship existed. The testimony presented by Plaintiffs indicated that Ms. Price was an independent woman who took care of herself and her finances. Although she resided with

Mr. Fenner, Mr. Fenner admitted that he was out of town often for his work, and that she stayed at the house alone during these times except for her brief recuperation period following her heart surgery in 2005. Plaintiffs did not present evidence that Ms. Ludrosky dominated Ms. Price in any way, much less to the extent that Ms. Ludrosky could have persuaded Ms. Price to execute a new will in her favor.

As we stated recently, "Undue influence 'upon a testator consists in substituting the will of the person exercising it for that of the testator.' The essential issue on a question of undue influence is whether 'the will is the will of the testator or that of another.'" *In re Estate of Hill,* No. E2006–01947–COA–R3–CV, 2007 WL 4224716, at *4 (Tenn.Ct.App.E.S., Nov. 30, 2007) (internal citations omitted). We find that the evidence presented by Plaintiffs does not preponderate against the Trial Court's finding that Ms. Ludrosky did not exercise undue influence over Ms. Price in the creation of her Will. Therefore, we hold that the Trial Court did not err in granting Defendant's Rule 41.02 motion on this issue.

### B. Testamentary Capacity

Plaintiffs also alleged that the Will was invalid because Ms. Price was not competent at the time she executed the Will. The Trial Court denied Ms. Ludrosky's Rule 41.02 motion on this issue at the close of Plaintiffs' proof. As a result, Defendant also presented evidence regarding Ms. Price's testamentary capacity, which we now summarize as relevant to this issue.

Sherry Allen, Ms. Price's hairdresser, testified that Ms. Price had an appointment with her on May 14, 2005, which

---

**10.** As we stated previously, a parent-child relationship alone does not give rise to a confidential relationship. *Iacometti,* 494 S.W.2d at 499.

lasted about three hours, and another on August 17, 2005. Ms. Allen said she talked to Ms. Price during those appointments and did not see any signs of dementia or Alzheimer's or other mental illness from Ms. Price. Ms. Allen testified that her mother and some of her clients have Alzheimer's, and so she is familiar with the symptoms of the disease.

Sonya Shults testified that she had known Ms. Price since 1956. Ms. Shults now lives in Florida, but she and Ms. Price had remained in touch. Ms. Shults visited Ms. Price in early 2004, and she said Ms. Price's mental condition was fine. During that visit, Ms. Price told Ms. Shults that she was leaving her home to Ms. Ludrosky and that Ms. Price wanted Mr. Fenner to move out of the house but he refused. According to Ms. Shults, Ms. Price also said that she had purchased Mr. Fenner's share of the house "because of some trouble he was in with the IRS." Ms. Shults said she had never seen any signs of dementia or Alzheimer's from Ms. Price.

Harold Manning, a friend of Ms. Price and brother-in-law to Ms. Shults, testified that he saw Ms. Price on April 9, 2004, when Ms. Price came to visit his dying wife. Mr. Manning stated that as Ms. Price was leaving his house that day, she advised Mr. Manning that he needed to get his affairs in order. Ms. Price added, "If anything ever happens to me, my house goes to Susie." Mr. Manning said she did not seem to be suffering from dementia, Alzheimer's disease, delusions, or hallucinations during their conversation.

Jerry Ludrosky, husband of Defendant Sue Ludrosky, testified that he spoke with Ms. Price at least twice a day. He said that Ms. Price showed no signs of mental illness, even up to the week of her surgery in June 2005. Mr. Ludrosky also testified that Ms. Price took care of everything "business-wise" for her household and also handled the business related to the Ludroskys' construction of their own home in 1997 and 1998. Mr. Ludrosky stated that Ms. Price was capable of taking care of her finances in 2004 and 2005. Mr. Ludrosky stated he had never heard his wife talk about having Ms. Price committed or examined for mental problems. Mr. Ludrosky stated that Ms. Price had never talked with him about a woman from Scotland. However, she did tell him about a woman who was driving by her house frequently.

Martha Reyes, Ms. Ludrosky's daughter, testified that she lived on Ms. Price's property for some time and saw her every day. Ms. Reyes said she never noticed signs of mental illness from Ms. Price. Ms. Price regularly cared for Ms. Reyes' baby while she was at work. In fact, Ms. Price continued babysitting the toddler, then two years old, until Ms. Price was admitted to the hospital in June of 2005. Ms. Reyes also said that Ms. Price handled her own business transactions.

However, Ms. Perry, who was called by Plaintiffs as a rebuttal witness, testified that Ms. Reyes told her that she needed to find another babysitter for her daughter because she thought Ms. Price was losing her mind. Ms. Reyes also told her that Mr. Fenner was having to help care for the child because Ms. Price was unable to run after her daughter.

Ms. Reyes testified that Ms. Price mentioned the woman from Scotland about once a week. Ms. Reyes said she had seen evidence of such a woman, stating as follows on cross-examination:

Q. Tell me what you know about a woman from Scotland.

A. We were in Michigan working and my grandmother pointed out a lady. We have seen this lady repeated times in other states, cars with Tennessee tags

from dealerships with very similar licenses to this woman.

Q. Similar licenses. And did you get the license numbers?

A. No sir.

Q. Okay. And did you keep track of the times and days that you saw these cars, to check up on it?

A. Just right after my grandmother passed that we really noticed the cars going by the trailer. It's one reason that I moved.

Ms. Ludrosky agreed that Ms. Price talked about the woman from Scotland frequently. Ms. Ludrosky also said that she noticed a car one night that started to pull into Ms. Price's driveway, then stopped in front of the house, revved its engine, and then drove away.

Bob Carroll, a Carter County constable, testified that Ms. Price visited him in the fall of 2001. Mr. Carroll related the purpose of her visit as follows:

She said that she was having some problems with a vehicle late at night pulling up in front of her house and revving the motor that had loud mufflers on it and squealing the tires and just aggravating her at night in front of her house.

\* \* \*

She proceeded to tell me that some of her family members were trying to convince her that she was going crazy, that she was losing her mind, and that this wasn't really happening. And said she was having problems sleeping.

Mr. Carroll testified that he offered to investigate the matter for her, as it was one of his duties as a constable. Mr. Carroll said that at the time, there also was a man at a nearby apartment complex who was stealing items. Mr. Carroll patrolled that area for several nights and stopped nearby to observe traffic. Mr.

Carroll testified as follows regarding the results of his surveillance:

About the third night there was a car that pulled up in front of the house and raced the motor a time or two, and jerked it down in gears, and spun the tires, and took off. At that point in time I couldn't see who was in the car. I could tell it was a dark-colored vehicle; that's basically all I could tell. But as time progressed, I kept noticing this car more and more. Sometimes it would do that three times a week, sometimes four times a week.

Mr. Carroll said that the driver appeared to be a blonde female, but he was not able to see the license plate on the car. One time Mr. Carroll saw what appeared to be the same car at a local store, but by the time he returned to the market, the car was gone and the cashier could not provide him with any information about the driver. Mr. Carroll described the rest of his investigation as follows:

I watched that area, with Franklin Apartments, two or three more nights; and again, the same thing would happen: This car would appear and it would stop in front of Ms. Price's house and rev the motor and squeal the tires and take off. I, again, saw this vehicle at that convenience store and saw a blonde-haired lady in the store talking to one of the clerks. So, I went in and asked this lady if she knew who the girl was, and she said, "Her name is Ann." And I said, "Well, do you know her last name?" She said, "I think it's Claymon, but" she said, "I've heard her tell the other girl it was Jillian."

Mr. Carroll stated that on one occasion while Ms. Price was out of town, he saw a blonde-haired woman in the same car pull up in Ms. Price's driveway, get out and knock on the door, then get back in the car and leave. Mr. Carroll reported his find-

ings to Ms. Price. He said that each time he talked with Ms. Price, she appeared rational and knew what she was talking about.

Ms. Ludrosky was the final defense witness who testified in person at the first hearing.[11] Ms. Ludrosky said that she and Ms. Price talked two or three times a day and that she visited her mother frequently. Ms. Ludrosky said they would often cook meals for each other. However, Mr. Fenner would rarely come in when he and Ms. Price went to the Ludroskys' home. Ms. Ludrosky testified that Mr. Fenner would wait in the car while Ms. Price ate with them.

Ms. Ludrosky conceded that Ms. Price and Mr. Fenner basically lived together as husband and wife, even though they never married. However, she stated that "for the past eight, ten years, they bickered, they fought, they cursed each other something terrible."

Ms. Ludrosky denied that she ever consulted a lawyer to have Ms. Price committed. She also denied threatening Ms. Price with the possibility of being confined in a mental institution. Ms. Ludrosky said that her mother was very independent and that Ms. Ludrosky could not make her do anything she did not want to do. However, Ms. Ludrosky stated that she had received calls from Mr. Fenner and Ms. Gray about having Ms. Price committed.

Although Ms. Price did not name Mr. Fenner in her Will, Ms. Ludrosky testified that her mother left the proceeds of some insurance policies to Mr. Fenner. In rebuttal, Mr. Fenner testified that he received insurance proceeds totaling $5,100

following Ms. Price's death. He also stated that he worked all summer to pay down Ms. Price's credit card debt. He said he had paid $35,000 to $40,000 so far, and he has paid off all of the credit cards except three.

Ms. Ludrosky testified that it was her mother's idea to speak with a lawyer on June 7, 2005. She said Ms. Price called her that morning and told her she needed to see a doctor that day. Ms. Ludrosky was getting ready to go to work, but she said she would cancel her cleaning appointment[12] and take Ms. Price to the doctor. Ms. Price then told her that she needed to see a lawyer before going to the doctor's office, and Ms. Price asked if Ms. Ludrosky knew a lawyer. Ms. Ludrosky testified that she told her mother that she did not know any lawyers, but that a woman that she works for sells real estate and knows some lawyers. Ms. Ludrosky called this woman, Ruth Vest. Ms. Vest recommended attorney John McKinnon, III, who practiced in Johnson City. Ms. Vest called Mr. McKinnon. Ms. Vest then told Ms. Ludrosky that Mr. McKinnon wanted to speak with her or her mother. Ms. Ludrosky said that Ms. Price asked her to make the phone call for her, and Ms. Ludrosky did so. Mr. McKinnon set up an appointment for later that morning, and Ms. Ludrosky took Ms. Price to Mr. McKinnon's office for the appointment.[13]

Mr. McKinnon testified and confirmed that he was the attorney who drafted Ms. Price's Will, Durable General Power of Attorney, and Durable Power of Attorney for Health Care on June 7, 2005. He stated that Ms. Price had been referred to

---

11. The Trial Court admitted the depositions of attorney John McKinnon, Dr. Vivian Clark, Dr. Walker, and Dr. Gerald Stipanuk.

12. Ms. Ludrosky cleans houses for a living.

13. Ms. Ludrosky said Ms. Price called Ms. Gray while she was waiting and asked if Ms. Gray wanted to go with them, but Ms. Gray declined. Ms. Gray denied receiving such a call.

him by a realtor friend of his through Ms. Ludrosky. Mr. McKinnon described his impression of Ms. Price on that day as follows:

> I thought she was a friendly, funny lady. I thought she was clearly in control of her faculties. She was responsive. I felt like she knew what she owned. She knew various family members. She was articulate. She related to me that she had a heart problem as I recall and that it was important and that she was going in for a medical procedure very quickly after our office visit. And she wanted to have the will prepared in case the worst happened to her that she were to die as a result of the heart surgery or some kind, I think it was heart related surgery that she was getting ready to undergo. And she was accompanied by her daughter, Sue Ludrosky, I believe is her name.

Mr. McKinnon testified that he did not see Ms. Ludrosky exercise undue influence over her mother, stating as follows:

> [O]bviously there was a loving relationship and there was an attachment between the two as you would expect between a mother and daughter, but I did not see that Ms. Price's will was overborne by that of her daughter.

Mr. McKinnon stated that he had no doubt as to Ms. Price's mental capacity to sign her will, and she impressed him as an "independent, forceful, successful lady." Ms. Ludrosky also testified that her mother seemed fine mentally that day, although she could not walk very far because of difficulty breathing.

Ms. Price told Mr. McKinnon that she was living with a man, and they discussed Ms. Price's decision to leave her entire estate to Ms. Ludrosky. During cross-examination, Mr. McKinnon recalled the conversation as follows:

A. I—I recall that the—Ms. Price mentioned that fact, that she was living with a man in a house that she owned. And there was conversation concerning the gentleman as to why she didn't leave him that house or why she was leaving everything to her daughter. So, yes, that—that topic came up in our conversation.

Q. Do you recall the specifics?

A. Specifically, Ms. Price told me that she knew her daughter, Sue Ludrosky, would take care of this gentleman with whom she was living, and would allow him to live in that house [14] and to otherwise support him out of her estate. And she had no qualms about leaving her entire estate to Sue because she knew Sue would do that after death from her assets.

Q. I see. And do you recall when she made that statement if Ms. Ludrosky was present at that time?

A. You know, I think we talked about that over and over again. I want to make very sure because we felt at the time that there might be some challenge to the will.

Q. Okay.

A. So I'm—I am confident we went over and over and over that point again. And I'm also confident that if Sue Ludrosky wasn't there for every one of those times we went over that point, that she was there at least some of those times.

---

14. Mr. McKinnon later clarified that Ms. Price said that she knew Sue would do the right thing and "allow that gentleman to live in that house-or a house, I don't know which house, and would take care of his needs ... from her estate." Thus, she did not specify to Mr. McKinnon whether Mr. Fenner would be permitted to live at the State Line Road Property or the smaller Birch Street Property.

Mr. McKinnon also stated that he specifically asked Ms. Price if she wanted a provision in the will to take care of the man with whom she lived, stating as follows:

> Yeah, we talked about that and I told her I could draft it any number of ways to absolutely assure her that—that he would be given a life estate in the house or we could make provisions for him in the will if she had any question about Sue not providing for him and we discussed it and vented it very thoroughly and the will that I prepared is what—exactly what she wanted.

Mr. McKinnon described Ms. Ludrosky as "animated" and "garrulous." Furthermore, he stated:

> There was certainly interaction among the three of us throughout the process. . . . And it may well be that—that Ms. Ludrosky told me that the way I drafted the will is what her mother wanted. She—so I may have drafted it on that basis, but again let me emphasize that I drafted it based on Ms. Price's specific instructions to me and she was absolutely aware of what she owned and what she was doing at the time. And I feel confident that this will reflects what she intended to happen to her estate.

Ms. Ludrosky denied having any input into the contents of Ms. Price's Will. She said that she did not participate in discussions between Ms. Price and Mr. McKinnon except to answer a question if he asked her. Ms. Ludrosky admitted that Ms. Price told her during the meeting with Mr. McKinnon that she wanted Ms. Ludrosky to take care of Mr. Fenner, but she didn't remember whether that encompassed letting him live at the State Line Road Property. Ms. Ludrosky said, "I know I was supposed to see that Bill was taken care of. But as far as living in that estate I don't recall." [15] Mrs. Ludrosky conceded that she probably agreed to Ms. Price's request.

During that appointment, Ms. Price also signed two durable powers of attorney naming Ms. Ludrosky as her attorney-in-fact for general and health care matters. The Will and powers of attorney were all drafted and executed during a single visit to Mr. McKinnon's office.

After their appointment with Mr. McKinnon, Ms. Ludrosky and Ms. Price ate at Shoney's. Ms. Ludrosky then took her mother to the emergency room because her mother thought she would see a doctor quicker that way than by going to her physician's office without an appointment. Ms. Price kept her Will and the powers of attorney until she went to the hospital later that day, at which time she gave them to Ms. Ludrosky to keep. Ms. Price remained in the hospital from June 7, 2005, until her heart surgery on June 15, 2005, and for several days after that.

Dr. Gerald Stipanuk, who is board certified in internal medicine, examined Ms. Price at the Johnson City Medical Center on June 7, 2005. He was her physician during her hospital stay there and saw her "very often." Dr. Stipanuk testified that, within a reasonable degree of medical certainty, Ms. Price did not have any mental problems and that she was competent to execute legal documents during the time she was his patient from June 7, 2005, to July 8, 2005. Dr. Stipanuk stated that he specifically examined Ms. Price for the purpose of determining whether she had any mental or emotional problems because

---

15. By agreement of the parties, the Birch Street Property was sold during the pendency of this case to help pay expenses of the Estate.

he knew she was having surgery and he needed to know whether she would be able to sign consent forms. Dr. Stipanuk further stated that "[O]n none of the occasions that I saw her did I ever get the feeling that she was in any way incompetent mentally."

Dr. William Walker is a heart surgeon in Johnson City. In August of 1995, Dr. Walker performed a triple coronary bypass and a mitral valve replacement on Ms. Price. After she recovered from the surgery, Dr. Walker had several follow-up appointments with Ms. Price, the last one being in July of 1996. Dr. Walker did not see Ms. Price again until June of 2005, when she once again began having heart problems. On June 15, 2005, Ms. Price underwent "redo heart surgery" to replace one of the bypass grafts and a mitral valve. Dr. Walker testified that Ms. Price made an informed decision with regard to her 2005 surgery and did not appear to be unduly influenced by anyone. Dr. Walker also testified that he saw no indication of mental illness by Ms. Price during any of his visits with her, stating as follows:

> She was really a delightful lady. She was kind of small, but always pretty spry and—and I had a pretty good relationship with her. I didn't notice anything about her affect that would have caused me to have concern.

Dr. Walker saw Ms. Price again on July 28, 2005, for a follow-up, and he noted that her condition was much better and that she was "mentally clear."

Dr. Vivian Clark is a doctor specializing in internal medicine in Elizabethton, Tennessee. Dr. Clark admitted Ms. Price to Life Care Center, a nursing home in Elizabethton, for rehabilitation on July 8, 2005, following open heart surgery. At the time of Ms. Price's admission, Dr. Clark examined Ms. Price and spoke to her and Ms. Ludrosky. The visit lasted approximately

45 minutes. Dr. Clark stated that within a reasonable degree of medical certainty, Ms. Price "definitely" had her mental faculties at the time of the exam and throughout her stay at the nursing home. Dr. Clark stated as follows regarding Ms. Price's mental condition:

> In fact, when I saw her for the first time, I was amazed that, for someone with multiple medical problems and age like she had, she was able to give me a very clear history of her medical problems. In the time that she was there for three weeks in the Life Care Nursing Home, I never remember her being confused or demented. In fact, the word dementia never came into her medical record at the nursing home.

Dr. Clark stated that she saw Ms. Price frequently during her nursing home stay because of her multiple medical problems. Dr. Clark described Ms. Price as alert and coherent. She also stated that Ms. Price "had a mind of her own" and was capable of making her own decisions.

After hearing all of the evidence, the Trial Court ruled from the bench that Ms. Price had the requisite testamentary capacity on June 7, 2005, to execute her Will.

In *In re Estate of Bean*, we discussed the issue of testamentary capacity as follows:

> Persons who execute wills must, at the moment of execution, understand what they are doing and the consequences of their action. As the Tennessee Supreme Court has repeatedly noted, a person executing a will must know and understand (1) the nature and the effect of his or her act, (2) the property he or she possesses, and (3) the manner in which his or her property will be distributed under the will. *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn.2002); *In re Estate of Elam*, 738 S.W.2d 169, 171–72 (Tenn.1987). Executing a will re-

quires less mental capacity than engaging in business transactions. *Owen v. Summers,* 97 S.W.3d 114, 125 (Tenn.Ct. App.2001); *Green v. Higdon,* 870 S.W.2d 513, 522 (Tenn.Ct.App.1993). In common terms, a person has the capacity to execute a will if he or she knows and understands what he or she is doing. *In re Estate of Elam,* 738 S.W.2d at 171–72; *American Trust & Banking Co. v. Williams,* 32 Tenn.App. 592, 602, 225 S.W.2d 79, 83–84 (1948).

*In re Estate of Bean,* No. M2003–02029–COA–R3–CV, 2005 WL 3262936, at *9 (Tenn.Ct.App.M.S., Dec. 1, 2005) (internal footnote omitted).

 In Tennessee, there is a presumption that a testator has the capacity to execute a will. As a result, the contestant has the burden of proving a lack of testamentary capacity at the time the will was executed. *In re Estate of Hill,* 2007 WL 4224716, at *3. Although the relevant time for determining testamentary capacity is the time of execution of the will, we have recognized that "evidence of the testator's mental and physical condition both before and after the execution of the will, within reasonable limits, is admissible to prove the testator's condition at the time the will was signed." *In re Estate of Bean,* 2005 WL 3262936, at *5 (citing *In re Estate of Mayes,* 843 S.W.2d 418, 427 (Tenn.Ct.App. 1992)).

The Trial Court thoroughly considered the evidence regarding Ms. Price's testamentary capacity and, indeed, summarized the two days' worth of testimony before issuing his ruling. Therefore, we quote with approval the following portion of his Memorandum Opinion:

Now, the testimony is convincing in this case that Ms. Price was a spry lady. Ms. Price had a mind of her own. The testimony is very convincing that Ms. Price was a very independent minded woman. It's very convincing that she did what she wanted. She did it when she wanted to.

The testimony is also convincing that Ms. Price was controlling and domineering and was jealous of Mr. Fenner. There was testimony also that Ms. Price kept up with the family finances. That she balanced the checkbook, that she took care of the bills, that she wrote the checks each month. And testimony that she quote, "Wheeled and dealed in real estate," close quotes.

Interestingly, Dr. Fenner, who I understand from the testimony is the younger brother of the Plaintiff, testified that he diagnosed Ms. Price in March of '05, about three months before she made this will, as schizophrenic. However, he did not have one record, not one record, that said anything about his diagnosis of Ms. Price as being schizophrenic. A very curious problem for a doctor to make a psychiatric diagnosis and never have a record of it. As a matter of fact, Dr. Fenner's records were totally devoid of any writing relating to the schizophrenia, the alleged schizophrenia and allusions and delusions that Ms. Price allegedly suffered.

Dr. Fenner is the least credible medical doctor who has ever testified in this court, in my eighteen years on the Bench and my thirty-seven years in the profession. Dr. Fenner was not convincing.

Now, the Defendant, the daughter of Ms. Price, I'm going to use her name a lot, so I'm just going to call her Defendant. She and her mother were close. They saw each other frequently. They usually spoke to each other several times just about every day. As a matter of fact, Ms. Price called her daughter, this Defendant, and related to her that she was ready to make her Will.

And as I understand it, asked her daughter, "Who's a lawyer that can make a Will?" And her daughter said, "I don't know, but I know a real estate agent who knows lawyers, so I'll call the real estate agent...." And that's exactly what this Defendant did. She called a real estate agent, Ms. Vest, and asked Ms. Vest who was a lawyer that could make a Will? Ms. Vest said, "Well," said, "John McKinnon, lawyer in Johnson City."

So as a result, the Defendant made arrangements in Mr. McKinnon's office for—to take Ms. Price by the office to have Mr. McKinnon draft her Last Will and Testament and to execute it and this is certainly nothing suspicious about that. This isn't Ms. Price's lawyer. This is not her daughter's lawyer. This is not ... a lawyer that's related to anybody, this is a lawyer that some real estate agent referred them to.

Mr. McKinnon was independent of all of the allegations in this case and did an independent job of—of drafting Ms. Price's Last Will and Testament.

Mr. McKinnon's testimony is unequivocal that Ms. Price knew exactly what she was doing while at his office on the day that she executed her will. They talked about it and Ms. Price never did act in such a way that would alert or even indicate to Mr. McKinnon that, this experienced lawyer, that Ms. Price did not have sound mind and disposing memory. In addition, Exhibit 1, the Last Will and Testament states very clearly that two witnesses over the age of eighteen years [sic] and the Will was admitted, the will was stipulated. These witnesses swear in there that this lady was over eighteen years of age and was of sound mind and disposing memory at the time she made that Will. It's unequivocal.

In addition, the Defendant offers the testimony of two doctors, maybe three, Ms. Clark was—Mr. Walker and the other one, who examined Ms. Price at or near the time of her execution of this Will, remembering that she went to the hospital this day, she was examined by a doctor this day, the day she made her Will. She went out to Shoney's, her favorite place to eat, and ate that day. And nobody, nobody, on that day, including these professionals, have testified to anything except that Ms. Price was of sound mind and disposing memory and knew what she was doing on the day that she executed that Will. They didn't see anything. They didn't hear anything. They observed her, she was fine.

\* \* \*

There is testimony that, and the Defendant admitted it, that although she got the entire estate of her mama, that her mama got a moral commitment from her, a moral obligation, not a legal obligation, the legal obligation is in the Will. Ms. Price got a moral commitment from her daughter, the Defendant, that she would, quote, "Take care of Bill," the Plaintiff.

This Court concludes from the record as a whole, that Plaintiffs have failed to carry their burden of proof. And, in fact, Ms. Price had the appropriate testamentary capacity on the date of the execution of her Will.

As we consider the evidence regarding Ms. Price's testamentary capacity, we are mindful of our limited role in reviewing the credibility assessments made by the Trial Court. In *Wells v. Tennessee Board of Regents,* our Supreme Court discussed witness credibility, stating:

Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which

best situates trial judges to evaluate witness credibility. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn.1990); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct.App.1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See Tenn–Tex Properties v. Brownell–Electro, Inc.*, 778 S.W.2d 423, 425–26 (Tenn.1989); *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn.Ct.App.1998). Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *See Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315, 315–16 (Tenn.1987); *Bingham v. Dyersburg Fabrics Co., Inc.*, 567 S.W.2d 169, 170 (Tenn.1978).

*Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn.1999).

This Court cannot recall a more disparaging assessment of witness credibility than the one offered by the Trial Court regarding Dr. Fenner. After reading the transcript of Dr. Fenner's testimony, we, too, are struck by his failure to document his alleged diagnosis of a serious mental illness in his patient's chart.[16] We find no reason to disturb the Trial Court's determination of Dr. Fenner's credibility.

As the Trial Court stated, three physicians testified that Ms. Price was competent on or near the date she executed her Will. Another physician, the one who treated Ms. Price in the nursing home approximately one month after she executed her Will, also confirmed that Ms. Price did not suffer from any mental illness. In addition, the attorney who drafted Ms. Price's will—an attorney who was referred by a third party and who had no prior relationship with any of the parties to this lawsuit—testified that Ms. Price had the capacity to execute her Will. She knew what she owned, who she wanted to give it to, and what the effects of that distribution would be. Indeed, Ms. Price even rejected Mr. McKinnon's repeated offers to include a provision in the Will granting Mr. Fenner a life estate in her real property or some other bequest to insure that he would be provided for.

The evidence does not preponderate against the Trial Court's finding that Ms. Price was competent to execute her Will. Therefore, we affirm the Trial Court's order upholding the validity of the Will.

### C. Partnership

After concluding that Ms. Price's Will was valid, the Trial Court held a second hearing to consider Plaintiffs' remaining allegations—namely, that Mr. Fenner was entitled to part of Ms. Price's Estate because they had entered into a partnership or, in the alternative, that a trust should be imposed upon the Estate assets for the use and benefit of Mr. Fenner.

The Trial Court conducted the second hearing on January 22 and 23, 2007. Much of the testimony in the second hearing duplicated what was presented at the first hearing. Therefore, we will summarize only the new evidence presented at the second hearing.

Mr. Fenner testified that Ms. Price only had a few items of personal property when she and Mr. Fenner moved in together in 1966. She did not have any real property or bank accounts, although she did own a car. Mr. Fenner testified that he earned good money from his business installing and refinishing bowling alleys, a business which he created about four years before

---

**16.** It has not escaped our attention that Dr. Fenner is the brother of Mr. Fenner, who stands to gain a significant amount of Ms. Price's Estate if her Will is declared invalid.

he and Ms. Price moved in together. At the beginning of their relationship, Mr. Fenner owned some equipment he used in his business but did not own any real property. He and Ms. Price bought the State Line Road Property and built a house on it, which they completed in 1972. They also built a garage and a storage unit on the property. In 1979, Mr. Fenner and Ms. Price purchased an adjacent lot on which they constructed a warehouse for Mr. Fenner's business. The couple lived in the house on the State Line Road Property until Ms. Price died in 2005 and Mr. Fenner was evicted subsequently.

When asked about the nature of their personal and business relationship, Mr. Fenner stated, "I would send the money home and she would spend it." Mr. Fenner stated that his business was incorporated for about 15 years during the 1970s and 1980s, and Mr. Fenner was the only person who owned stock in the corporation. Mr. Fenner stated as follows regarding Ms. Price's involvement in the corporation:

> Back when I was incorporated, you know, she could sign the checks, you know. She didn't want her name on the corporation, you know, afraid, you know,—she hated courts; she was afraid she might get tied up somehow and have to go to court.

Mr. Fenner stated that after he unincorporated his business, he did not have any other business partners or anyone else that he shared money with other than Ms. Price. Plaintiffs introduced a financial statement for Mr. Fenner and Ms. Price prepared in 1978, which set a value of approximately $225,000 on Mr. Fenner's business. On cross-examination, Mr. Fenner explained the nature of the business assets reflected on that statement, as well as their current status:

Q. You listed back when you did this deed—or this financial statement, that your business was worth two hundred and twenty-five thousand, one hundred and seventy-three ($225,173.00) dollars.

A. Yeah, probably was, counting all the vehicles and everything.

Q. And you went from a corporation to a sole proprietorship . . .

A. Right.

Q. . . . or was it a partnership?

A. Proprietorship.

Q. Sole proprietorship.

A. Uh-huh.

Q. You owned it all.

A. Yes.

Q. And do you still own it all?

A. Yes.

Q. And it's in that warehouse out there.

A. Basically, yes.

Mr. Fenner stated that Ms. Price deposited the money he earned in several bank accounts, some joint accounts and some accounts in her name only. Mr. Fenner testified that Ms. Price listed only herself on several of the accounts because he traveled frequently for his work, and she was the one who wrote out checks and made purchases with the funds. Mr. Fenner testified that Ms. Price did not work while they were together, although she received Social Security benefits at various times throughout her life. He added that the Social Security checks Ms. Price received were used to pay her supplemental insurance.

Kathy Melton, Mr. Fenner's daughter, described the arrangement between Mr. Fenner and Ms. Price regarding household and business matters as follows: "[S]he took care of us and Daddy worked out of town and sent her money to provide for us, and for the house, expenses and stuff."

Ms. Melton stated that her father was an excellent provider and that Ms. Price "had anything she wanted."

Mr. Fenner testified that he and Ms. Price accumulated quite a bit of real estate, and it was titled in both of their names. In the mid–1980s, Mr. Fenner deeded all of his interest in the properties to Ms. Price. Mr. Fenner testified that he deeded the properties to Ms. Price "to keep the IRS from getting it" and because Ms. Price "didn't want [the IRS] to come in and take the house."

Ruth Whitaker, Ms. Price's niece, testified as follows regarding the circumstances surrounding the transfer of real estate from Mr. Fenner to Ms. Price:

> I know about when Bill owed the Internal Revenue [sic] because Helen borrowed five thousand ($5,000) dollars from me, saying she didn't have no money, but I knowed she did. But I loaned it to her. And she said that she was going to put the house over in her name until Bill got that straightened out, and then she was going to put it back over like it's supposed to be.

Most of those properties were subsequently sold, and Mr. Fenner testified that the proceeds were used to pay off Ms. Price's credit cards.

Plaintiffs introduced reciprocal wills executed by Mr. Fenner and Ms. Price in 1966. Mr. Fenner testified that after they created the reciprocal wills in 1966, the couple executed a mutual will in 1970 bequeathing their property to each other. Mr. Fenner said they kept the mutual will in a folder at their house, but he was unable to locate the document after Ms. Price's death. Mr. Fenner said he last saw the 1970 will about a year before Ms. Price died. Mr. Fenner stated that Ms. Price never told him that she had executed a new will in 2005, and he did not learn about it until after her death.

Ms. Price had a safe deposit box in her name and Ms. Ludrosky's name at a local bank. Mr. Fenner testified that Ms. Price used the safe deposit box to store her diamonds and other valuable jewelry. Mr. Fenner testified that he purchased all of the jewelry for Ms. Price, and he estimated the value of the jewelry in the safe deposit box to be between $100,000 and $150,000. Mr. Fenner stated that those pieces of jewelry were part of Ms. Price's estate, and they came up missing after Ms. Ludrosky opened the box after Ms. Price's death. When asked if the jewelry items were gifts to Ms. Price, Mr. Fenner responded, "I would imagine so; but I paid for it, she didn't." [17]

Connie Sue Fenner Gray, Mr. Fenner's daughter, testified that Ms. Ludrosky rarely visited Ms. Price, adding that "she may have spoken to Mama a lot, but visits to the house, unless Mama called and needed something or she had a reason to come up there, there was not many visits, not a whole lot." Mr. Fenner testified that Ms. Ludrosky only visited Ms. Price once every month or two months, although she did call more often.

Plaintiffs also introduced into evidence the deposition of Mr. McKinnon, the attorney who drafted Ms. Price's Will.[18] Various deeds recording the couple's purchase of

---

17. During the hearing, Mr. Fenner apparently claimed an interest in Ms. Price's extensive jewelry collection. However, the Trial Court concluded that Mr. Fenner had no interest in the jewelry because, as he admitted, he gave those items to Ms. Price as gifts. We agree with the Trial Court's assessment of this issue.

18. This was the same deposition of Mr. McKinnon that was admitted during the first hearing.

tracts of real property and Mr. Fenner's transfer of his interest in those properties to Ms. Price also were admitted as exhibits.

At the conclusion of Plaintiffs' proof, Defendant moved for involuntary dismissal of Plaintiffs' claims of a partnership or an implied or resulting trust pursuant to Tenn. R. Civ. P. 41.02. The Trial Court held that Plaintiffs had failed to prove the existence of a partnership between Ms. Price and Mr. Fenner and, therefore, granted Defendant's motion on that issue. However, the Trial Court reserved its ruling on the remainder of the Rule 41.02 motion.

We will consider Plaintiffs' claim of error regarding the partnership issue before reviewing the remaining evidence presented during the second hearing. The Revised Uniform Partnership Act defines a "partnership" generally as "an association of two (2) or more persons to carry on as co-owners of a business or other undertaking for profit...." Tenn.Code Ann. § 61–1–101(6). We have held that determining what constitutes a partnership is generally a matter of law, but whether a partnership exists under conflicting evidence is a question of fact. *Wyatt v. Brown*, 39 Tenn.App. 28, 281 S.W.2d 64, 68 (1955). Because there was no written partnership agreement between Mr. Fenner and Mr. Price, Plaintiffs bear the burden of proving the existence of a partnership by clear and convincing evidence. *See Tidwell v. Walden*, 205 Tenn. 705, 330 S.W.2d 317, 319 (1959); *Kuderewski v. Estate of Hobbs*, No. E2000–02515–COA–R3–CV, 2001 WL 862618, at *3 (Tenn.Ct.App. E.S., July 30, 2001).

Our Supreme Court considered the issue of an implied partnership in the context of a man and woman who were romantically involved in *Bass v. Bass*, 814 S.W.2d 38 (Tenn.1991). In that case, the Court held that "the existence of a partnership may be implied from the circumstances where it appears that the individuals involved have entered into a business relationship for profit, combining their property, labor, skill, experience, or money." *Bass*, 814 S.W.2d at 41 (internal footnote omitted).

In *Bass*, Linda Bass and William Bass dated for some time and then moved in together in 1975. *Id.* at 39–40. In 1976, Mr. Bass acquired a restaurant in a nearby town, and the couple moved there to operate the restaurant. *Id.* at 40. The Supreme Court summarized the couple's business activities in subsequent years as follows:

The Plaintiff initially operated the restaurant by herself, working 17 hour days taking orders, cooking meals, cleaning, and running the cash register.... When William Bass began working at the restaurant, he and the Plaintiff each worked 12 hour shifts in order to keep the restaurant open 24 hours a day. Linda Bass was not compensated for her efforts at the restaurant, although she worked there extensively from 1976 to 1981, when the restaurant burned. During the time that Linda Bass worked at the restaurant, William Bass started a video amusement game business....

* * *

The Plaintiff would assist William Bass in the daily servicing of the video machines, help decide where new machines should be located, and kept most of the records of the various businesses. Although she was not listed as a partner or co-owner of any of the businesses, she wrote and signed most of the checks for the operation of the businesses, worked on the machines, and collected money from them (sometimes more than once a day). She was not paid a salary or wages for her efforts.

*Id.* The trial court concluded that Linda Bass and William Bass had an implied partnership. We reversed, but the Supreme Court reinstated the trial court's original judgment, finding that Linda Bass was entitled to half of the partnership assets upon the death of William Bass. *Id.* at 44. In doing so, the Supreme Court stated, "It was through the joint efforts of William Bass and Linda Bass that the businesses prospered. That prosperity was due in equal part to the effort of Linda Bass." *Id.*

The facts set forth in *Bass* are drastically different from those presented by Plaintiffs in the case now before us. Mr. Fenner opened his bowling alley refinishing business before he and Ms. Price began living together, and Mr. Fenner purchased all of the equipment to operate that business. Although Ms. Price occasionally drove a truck to one of Mr. Fenner's job sites to deliver materials, this was not a regular responsibility for her, and she was not significantly involved in the daily activities of the business. Rather, the record is uncontroverted that Ms. Price's "job" was raising Mr. Fenner's children. According to the evidence presented, Ms. Price did not want her name involved with the business when it was incorporated, nor did she own any part of the business after Mr. Fenner unincorporated it. Indeed, Mr. Fenner testified that he converted the corporation to a sole proprietorship, and he owned all of it. There is also no evidence that Ms. Price participated in any business decisions. While there was some testimony indicating that Ms. Price may have written business checks for Mr. Fenner, we do not find that this activity is sufficient to establish an implied partnership under Tennessee law.

We agree with the Trial Court's conclusion that Plaintiffs failed to satisfy their burden of establishing a partnership be-

tween Ms. Price and Mr. Fenner by clear and convincing evidence. Therefore, we affirm the Trial Court's grant of Defendant's Rule 41.02 motion on this issue, as well as the Trial Court's subsequent ruling that the bowling alley business equipment is Mr. Fenner's separate property.

### D. Ms. Ludrosky's Failure to Testify at Second Hearing

■ Plaintiffs also raise an issue regarding the effect of Ms. Ludrosky's failure to testify at the second hearing.

Defendant called Mr. Fenner to testify as an adverse witness. In response to the inquiries of defense counsel, Mr. Fenner once again stated that he had paid off any debts to the IRS before transferring his interest in the couple's real property to Ms. Price in the mid–1980s. However, Defendant introduced proof of a federal tax lien in the amount of $6,061.38, which was filed against Mr. Fenner on November 8, 1989, and released on April 16, 1990. Defendant also introduced a lien filed against Mr. Fenner by the Tennessee Department of Employment Security which was not released until 1995. Defendant also introduced two judgment liens recorded against Mr. Fenner in 1985 and 1988 for a total of nearly $20,000.

Defendant called one other witness to testify at the hearing, but the Court sustained Plaintiffs' objections to her testimony about statements allegedly made by Ms. Price regarding Mr. Fenner's business. Ms. Ludrosky did not take the witness stand in the second hearing.

After the close of all proof, Plaintiffs' counsel moved for a transcript of Ms. Ludrosky's testimony from the March 29, 2006, hearing to be admitted into evidence. The Trial Court declined to do so, as the motion was not made during Plaintiffs' case in chief. Plaintiffs' counsel then asked if Ms. Ludrosky's pretrial discovery

deposition had been introduced as an exhibit during this hearing, and the Trial Court stated that it had not. As a result, no testimony from Ms. Ludrosky was presented during the second hearing by either Plaintiffs or Defendant.

Plaintiffs assert that Ms. Ludrosky's failure to testify should have resulted in a conclusion by the Trial Court that her testimony, had it been given, would have been prejudicial to her case. We disagree.

■ In support of their assertion, Plaintiffs rely on what is known as the "missing witness rule," which provides that "the failure of a party to call a witness gives rise to a permissible inference that the missing witness' testimony would have been unfavorable to the party who failed to call the witness." *Gentry v. Gentry*, No. E2000–02714–COA–R3–CV, 2001 WL 839714, at *4 (Tenn.Ct.App.E.S., July 25, 2001) (citing *State v. Francis*, 669 S.W.2d 85, 88 (Tenn.1984)) (internal footnote omitted). Though some earlier courts may have characterized it as a "presumption," our Supreme Court has clarified that the missing witness rule "is now generally characterized as authorizing a permissive inference." *State v. Francis*, 669 S.W.2d at 88. As a result, the Trial Court was free to accept or reject an inference that Ms. Ludrosky's testimony would have been unfavorable to her case.

Although the Trial Court did not explicitly address this issue, we see no evidence in the record to indicate that the Trial Court attributed any significance to Ms. Ludrosky's failure to testify. We find no error with its decision in this regard, especially given the fact that Plaintiffs failed to raise this issue before the Trial Court.

■ As our Supreme Court has stated, "We fully recognize the general rule that a defendant in a civil case is not required to testify and has the right to rely upon the duty of the plaintiff to carry the burden of proof and to avail himself of the plaintiff's failure to make out a case." *Runnells v. Rogers*, 596 S.W.2d 87, 90 (Tenn.1980). Furthermore, any inference taken from application of the missing witness rule "is not to be taken as substantive proof and never relieves the party onerated with the burden of proof of making out a prima facie case." *Arnett v. Fuston*, 53 Tenn.App. 24, 378 S.W.2d 425, 428 (1963).

Plaintiffs bore the burden of establishing a partnership in favor of Mr. Fenner. If they felt that Ms. Ludrosky's testimony was necessary to prove the elements of their claim, Plaintiffs were free to introduce transcripts of her deposition and/or her testimony from the first hearing during their case in chief. Plaintiffs also could have called Ms. Ludrosky as an adverse witness-a technique that Defendant herself employed. Plaintiffs did none of these things. Plaintiffs' assertion of error regarding this issue is without merit.

### E. Imposition of a Trust for Mr. Fenner's Benefit

■ In their appellate brief, Appellants allege that the Trial Court erred by refusing to impose a trust upon the assets of Ms. Price's Estate for the benefit and use of Mr. Fenner. In the corresponding argument section of their brief, Plaintiffs quote from opinions of this Court and the Tennessee Supreme Court regarding resulting trusts, constructive trusts, and unjust enrichment. Plaintiffs conclude this portion of their appellate brief with the following statement:

> The Plaintiffs would show that William G. Fenner, Sr., under the proof is the equitable owner of the property at issue, and that a trust should be imposed on the assets of the estate of Helen Price to prevent unjust enrichment to the detriment of Mr. Fenner.

Plaintiffs neither cite any specific facts from the record in support of this bald assertion, nor do they attempt to explain why the Trial Court erred by failing to impose a trust upon the Estate.

Rule 27 of the Tennessee Rules of Appellate Procedure specifies that an appellant's brief must contain, *inter alia:*

> (7) An argument, which may be preceded by a summary of argument, setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on. . . .

Tenn. R.App. P. 27(a)(7).

A party's failure to comply with the appellate brief requirements set forth in Tenn. R.App. P. 27 can have dire consequences, as we have warned repeatedly:

> Courts have routinely held that the failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief as required by Rule 27(a)(7) constitutes a waiver of the issue. *See State v. Schaller,* 975 S.W.2d 313, 318 (Tenn.Crim. App.1997); *Rampy v. ICI Acrylics, Inc.* 898 S.W.2d 196, 210 (Tenn.Ct.App.1994); *State v. Dickerson,* 885 S.W.2d 90, 93 (Tenn.Crim.App.1993). Moreover, an issue is waived where it is simply raised without any argument regarding its merits. *See Blair v. Badenhope,* 940 S.W.2d 575, 576–577 (Tenn.Ct.App.1996); *Bank of Crockett v. Cullipher,* 752 S.W.2d 84, 86 (Tenn.Ct.App.1988).

\* \* \*

As noted in *England v. Burns Stone Company, Inc.,* 874 S.W.2d 32, 35 (Tenn. Ct.App.1993), parties cannot expect this court to do its work for them. This Court is under no duty to verify unsupported allegations in a party's brief, or for that matter consider issues raised but not argued in the brief. *Duchow v. Whalen,* 872 S.W.2d 692, 693 (Tenn.Ct. App.1993) (*citing Airline Const. Inc., v. Barr,* 807 S.W.2d 247 (Tenn.Ct.App. 1990)).

*Bean v. Bean,* 40 S.W.3d 52, 55–56 (Tenn. Ct.App.2000).

Plaintiffs failed to cite to any specific facts in the record supporting their argument that the Trial Court should have imposed a trust upon the assets of the Estate. Because Plaintiffs failed to comply with the requirements of Tenn. R.App. P. 27(a)(7), we hold that Plaintiffs have waived this issue on appeal.

### F. Rule 41.02 Involuntary Dismissals

Plaintiffs raise a separate issue regarding whether the Trial Court erred in granting Defendant's Rule 41.02 motions for involuntary dismissal on Plaintiffs' claims of undue influence and partnership. As we have discussed thoroughly in the preceding portions of this Opinion, we find no error with the Trial Court's dismissal of those claims. This issue is without merit.

### III. Conclusion

After careful review, we affirm the Trial Court's orders dismissing Plaintiffs' claims and remand to the Trial Court for collection of costs. Costs on appeal are taxed against the Appellants, William G. Fenner, Sr., William G. Fenner, Jr., Terry Wayne Fenner, Kathy Fenner Melton, Connie Fenner Gray, Willie Jo Perry, Chucky Price, David Price, Chris Price, and Kathy Price Lyon, and their surety, if any.