IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
OCTOBER 22, 2008 Session

# BOBBY THOMPSON, Individually, and as Executor of the Estate of Gertrude Thompson, Deceased v. JAMES HAYWOOD THOMPSON, ET AL.

### Direct Appeal from the Circuit Court for Dyer County
### No. 06-10    Allen W. Wallace, Judge

_____

### No. W2008-00489-COA-R3-CV - Filed March 12, 2009

_____

This case involves two brothers and their mother's estate. One brother filed suit against the other, claiming that the defendant brother and his family members wrongfully converted certain assets belonging to his mother and obtained other assets through undue influence. The trial court found no conversion or undue influence. We affirm.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Matthew W. Willis, Dyersburg, TN, for Appellant

John W. Palmer, Dyersburg, TN, for Appellees

**OPINION**

# I. FACTS & PROCEDURAL HISTORY

Calvin and Gertrude Thompson were married for many years and had two sons – Haywood, who was born in 1938, and Bobby, who was born in 1941. Gertrude executed a will in 1978, which devised all of her estate to her husband, Calvin, if he survived her. In the event that Calvin predeceased Gertrude, the will provided that Haywood and Bobby would equally share Gertrude's estate. The will nominated Haywood and Bobby as co-executors of Gertrude's estate.

Calvin Thompson died on July 9, 2002, and Gertrude died on March 8, 2005. Following Gertrude's death, Bobby filed a complaint, individually and as executor of Gertrude's estate, against his brother Haywood, Haywood's wife, Carolyn, Haywood's son, Mike, and Haywood's daughter-in-law, Theresa. The complaint alleged that the defendants had engaged in fraud and conspiracy and committed the tort of conversion in their dealings with Gertrude's finances, real property, and personal property prior to her death. The complaint also stated that Haywood possessed a power of attorney over Gertrude's affairs, and it alleged that Haywood breached the fiduciary duty he owed to Gertrude in dealing with her property.

Prior to trial, the parties agreed that only four issues were in controversy, and they submitted a document entitled "Stipulated Issues to be Determined by the Court," which listed the issues to be determined as follows:

1. Whether or not the real estate conveyed by Gertrude Thompson to Haywood Thompson and wife, Carolyn Thompson by deed recorded February 4, 2004 . . . was obtained by the Grantees as a result of undue influence exerted upon Gertrude Thompson by the Grantees, thereby rendering the conveyance void so that the real estate would pass under the [will] to her sons, Bobby Jones Thompson and James Haywood Thompson[.]

2. Whether or not the real estate conveyed by Gertrude Thompson to Haywood Thompson and wife, Carolyn Thompson by deed recorded December 30, 2003 . . . was obtained by the Grantees as a result of undue influence exerted upon Gertrude Thompson by the Grantees, thereby rendering the conveyance void so that the real estate would pass under the [will] to her sons, Bobby Jones Thompson and James Haywood Thompson[.]

3. Whether or not any of the amounts of money identified on Exhibit "A" to this instrument[1] . . . were obtained by Haywood Thompson and wrongfully converted to his use and benefit so that a judgment should be entered against

---

[1] Exhibit A to the "Stipulated Issues" document specifically listed thirty-eight withdrawals that were made between 1998 and 2004 from various accounts owned, at least in part, by Gertrude. The challenged withdrawals ranged from $100 to $12,470.

Haywood Thompson in favor of the Estate of Gertrude Thompson for any such amount.

4.      Whether or not any farm related machinery or equipment, automobile, necklace, or ring owned by Gertrude Thompson was obtained by any of the Defendants and wrongfully converted to the use and benefit of any such Defendant so that a judgment should be entered against any such Defendant in favor of the Estate of Gertrude Thompson for the fair market value of any such property.

The "Stipulated Issues" document further provided that these were "the only issues to be submitted to the Court for determination."

At trial, Haywood testified that he had lived four miles from his parents' house and taken care of them for approximately forty years. Haywood testified that he previously lived in Memphis, but after his father had a heart attack in 1967, he moved back to Newbern and began working with his father on the farm. Haywood said that he had always had a horrible relationship with his brother, Bobby, and he said that when Gertrude died, he was not on speaking terms with him. Haywood testified that Bobby was living with his parents in 1994, but his parents threw Bobby out of their house. According to Haywood, Calvin had bypass surgery, and Bobby was "laid up in their house drunk." Haywood testified that when Calvin returned home from the hospital, Bobby told Calvin that he intended to take over the farm and build houses "all over the place." Calvin allegedly became angry and told him to "hit that road and don't come back." Haywood testified that Gertrude fully supported Calvin in his decision. He also testified that Bobby had not been back to his parents' house since the dispute in 1994, but he accused Bobby of stealing things from the house when no one was home. Haywood said that Calvin had undergone six bypass surgeries over the years, but Bobby never visited Calvin in the hospital. Calvin also battled Alzheimer's Disease for approximately seven years.

In 1998, Haywood's name was listed as an authorized signatory on his parents' checking account, and his name was added to his parents' savings account as early as 1999. Haywood's name was also listed on various certificate of deposit accounts owned by his parents, either as an additional account holder or as the pay-on-death beneficiary. Haywood testified that around 2002, money started "disappearing" out of his parents' bank accounts, and family members suspected that another family member's ex-wife was taking advantage of Calvin's confusion due to Alzheimer's Disease and accompanying him to the bank in order to withdraw money. On January 10, 2002, Gertrude executed a document giving Haywood power of attorney. That same week, Haywood closed his parents' checking and savings accounts, an IRA, and several certificate of deposit accounts, and he deposited all the money in a "Special Account"[2] in his name only, payable on death to his wife, Carolyn. Haywood testified that he deposited all of the money in the Special Account at Gertrude's

___

[2] The terms of the "Special Account" are not clear from the record, but the bank records from the account list it as "Spec. Acct," and the branch manager of the bank testified that she recalled setting up the account styled as "a special account."

request[3] and used the money for her benefit. He said he routinely withdrew money from the Special Account and deposited it in Gertrude's separate checking account. He testified that he also withdrew money from the Special Account and gave it to Gertrude in cash when she needed it. In addition, Haywood wrote checks from the Special Account to pay various expenses and bills incurred by Gertrude.

Calvin died in July of 2002 at approximately ninety years old. Bobby did not attend Calvin's funeral. After Calvin died, Haywood visited Gertrude at her home several times a day. He testified that Gertrude began spending time every day driving around to visit friends and family. He said she never got lost when she was driving around, and she carried on conversations with everyone she knew in town.

Haywood testified that Gertrude knew he would take care of her for the rest of her life, and he said she instructed him to "get everything fixed" so that he and his family would have everything when she died. Haywood said that Gertrude told him that she did not want Bobby to have anything. Haywood testified that he knew Gertrude had a will, and that it was in Bobby's possession, but he did not know its contents. On September 14, 2003, Gertrude executed a quitclaim deed conveying 23.35 acres of her land to Haywood and his wife. Haywood, Gertrude, and Haywood's wife, Carolyn, went to an insurance agent's office to have the deed notarized. . This deed was recorded on December 30, 2003. On January 29, 2004, Gertrude executed another quitclaim deed conveying the adjoining sixteen-acre tract of land, where Gertrude's house was located, to Haywood and his wife. Haywood, Gertrude, and Carolyn again went to the insurance agent's office to have the deed notarized. This deed was recorded February 4, 2004. However, Gertrude continued to live on the property.[4]

Haywood said that during 2004, he became concerned that Gertrude was taking too many medications, so he began taking her medicine to her every morning and every night. Gertrude was able to drive until August 31, 2004, when her doctor advised Haywood to take her car away. Haywood testified that Gertrude became terribly mad when he took her car away, and thereafter, he

---

[3] Haywood testified that he created the power of attorney document using a computer program after Gertrude asked him to take care of some things. He and Gertrude went to an insurance agent's office to have it notarized. **(p.41).** At another point in the testimony, Haywood was questioned about the instructions he received from Gertrude about combining the accounts. Following objections by Bobby's attorney, the trial court instructed Haywood not to testify about any instructions from Gertrude regarding these transactions. Tennessee Code Annotated section 24-1-203, the so-called "dead man's statute," provides:

> In actions or proceedings by or against executors, administrators, or guardians, in which judgments may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with or statement by the testator, intestate, or ward, unless called to testify thereto by the opposite party.

[4] In 1990, Calvin and Gertrude had entered into a contract with Haywood's son, Mike, and Mike's wife for the purchase of the 23 acre tract in exchange for a $35,025 promissory note. In 1999, Mike and his wife divorced, and Mike subsequently filed for bankruptcy. Haywood testified that the land sales contract "didn't go through" due to the bankruptcy.

had to "ride her around everyday and go with her." Haywood testified that Gertrude never mentioned going to visit Bobby. However, he testified that on one occasion he drove Gertrude to Bobby's house, and Bobby told him to "put the bitch back in the car and carry her home."

Gertrude moved in with Haywood and his wife on or about September 1, 2004. Haywood testified that Gertrude subsequently decided that she wanted to move into a retirement center so that she could "be around people all of the time." Gertrude moved to a retirement center in January of 2005, and she died on March 8, 2005, at the age of eighty-seven.

Gertrude's medical records were introduced at trial. In 1997, her physician noted that Gertrude "continues to do quite well. . . . She really doesn't have any outstanding problems and she has reached the age of 79 and looks and feels great." In 1999, at the age of eighty-one, Gertrude first reported having decreased recent memory when she suffered from vertigo. Another record from 1999 reflected that Gertrude had decreased recent memory, but her remote memory, judgment, and insight were indicated as normal. No subsequent memory problems were noted until 2002, when Gertrude's records reflected that she suffered from depression, anxiety, and decreased memory. In late 2003, Gertrude's medical records noted memory loss, decreased cognitive function, "mind getting worse," and dementia. However, a July 2, 2004 medical record states, "Patient continues to do remarkably well – her memory loss has not progressed – she still drives her own car – she never gets lost, etc. – her son doses out her meds every morning." The July 2004 record stated that Gertrude's major problems revolved around her musculoskeletal complaints, such as diabetic neuropathy and osteoporosis. A subsequent record from October 15, 2004, indicated that Gertrude was suffering from dementia and stated, "Her family is tightly regulating her medicines and not letting her drive or drive to the drugstore. She comes today with numerous complaints. She complains about her back, she insists on being institutionalized in a nursing home (family refuses)."

Haywood testified that Gertrude had short-term memory loss on a couple of occasions when she would take too much of her pain medication, but he insisted that there was nothing wrong with Gertrude's mind. He said she did suffer from depression while Calvin had Alzheimer's Disease prior to his death, but he claimed that this improved after Calvin died.

Bobby Thompson also testified at trial. He had been retired since 1998, but he previously worked building houses. Bobby testified that he was living with his parents in 1994, but he insisted that he was not thrown out of the house. Bobby denied saying that he intended to turn the farm into a subdivision, and he claimed that he simply moved out of his parents' house in 1996. Bobby was asked if he visited Calvin in the hospital when he had six bypass surgeries, and he said that he visited him when he had the first surgery. Bobby testified that his relationship with Gertrude was "just fine in my book." He testified that Gertrude would come to visit him when she was out driving around. He said, "Mother was still driving around and doing everything. Nothing was wrong with her, just her mind was off." Bobby testified that the last time he visited his mother's house was in July of 2004. He said he did not know when Gertrude moved into Haywood's house, and he said no one told him when she moved into the retirement center. Bobby said he did not visit Gertrude in the

hospital just before she died because he did not know she was there. He testified that he did not attend Calvin's funeral or Gertrude's funeral, stating, "I don't go to funerals."

Bobby testified that Calvin owned two tractors when he was alive, as well as various items of farm equipment. Bobby said he did not know what happened to the tractors, but he claimed he saw some of the equipment on the farm as late as 2001. Bobby testified that when he was growing up, his mother always wrote checks for purchases and did not carry large amounts of cash.

Bobby and Haywood's first cousin, Kenneth Glidewell, also testified at trial. He testified that he went out to eat catfish with Gertrude nearly every Friday, and Gertrude would drive her car and either pick him up on the way or meet him there. He said their weekly meetings continued until shortly before she moved into the retirement center, and Gertrude always carried on normal conversations. Mr. Glidewell described Gertrude as "a woman of her own," stating that she was "pretty independent" and "never did ask nobody for help or anything." He also described Gertrude as strong-willed and having "a mind of her own." Mr. Glidewell stated that Haywood and Carolyn were at Gertrude's house a lot, and he said he also helped to drive Gertrude around when she was not allowed to drive anymore. Mr. Glidewell said he had several conversations with Gertrude about how she had her affairs in order.

Cathy Baucom testified that she was employed to assist in caring for Calvin when he had Alzheimer's Disease. Ms. Baucom said that she worked for Gertrude three to four days per week, doing housework, helping to bathe Calvin, or just sitting with Calvin for hours at a time. After Calvin's death, Ms. Baucom went out to eat with Gertrude occasionally, and Gertrude would drive them. Ms. Baucom testified that she also saw Gertrude at various places around town. Ms. Baucom said she never noticed Gertrude experiencing any problems with short-term memory loss. Ms. Baucom said she talked to Gertrude at a local grocery store just a few months before she passed away, and Gertrude was "just her same old self." She described Gertrude as a strong-willed person who was determined to do things for herself. Ms. Baucom testified that she had never seen Bobby at Gertrude's house, while she was caring for Calvin or after his death. She testified that Haywood and Carolyn would come to Gertrude's house often, to help with Calvin, to take Gertrude's car to get it serviced, or go with Gertrude to the doctor.

Haywood and Carolyn's daughter, Lisa Fletcher, testified about witnessing arguments between Bobby and his parents when Bobby was drinking, including the big argument between Bobby and his parents when Calvin kicked him out of the house. Ms. Fletcher testified that she visited Gertrude in the months before she died, and Gertrude's "mind was fine." She said Gertrude "had a mind of her own" and described her as independent, hard-headed, and determined. She said "when she made her mind up, . . . that's the way it was going to be." Ms. Fletcher said she did not observe any signs that Gertrude suffered from memory loss or dementia.

Haywood's son, Mike Thompson, also testified about witnessing arguments between Bobby and his parents. He said most of the arguments were about Bobby drinking and telling his parents what to do. Mike testified that he bought a tractor from Calvin in 1992 for $5,000, and he purchased

two pieces of farm equipment from Gertrude after Calvin died. Mike said he still had the cancelled checks from the purchases, and he said he never received any equipment that he did not buy. Mike testified that he saw Gertrude practically every day after Calvin died, and he said she "knew what she wanted to do" even when she made the decision to move to the assisted living facility. Mike testified that he and his wife currently lived in the house where Gertrude and Calvin had lived. He said he entered into a contract to buy the property from Haywood after Gertrude died.

Mike Thompson's wife, Theresa, testified that she and her husband started remodeling Gertrude's house around the end of 2004, while Gertrude was living with Haywood, because they intended to eventually move into the house. Theresa testified that she saw Gertrude every day until she moved to the retirement center, and she said Gertrude would come to the house while they were remodeling it to see the work that had been done. Theresa said she did not notice any signs of memory loss or dementia. Theresa testified that Bobby never came to the house looking for Gertrude while they were remodeling it, and she said that she met Bobby for the first time when he came to the house after Gertrude died. Theresa described Gertrude as "very determined" and said Gertrude "did everything she wanted to do" and did nothing she did not want to do.

John Uitendaal testified that he notarized the two deeds executed by Gertrude in September of 2003 and January of 2004. Mr. Uitendaal said he had known Gertrude since he was about five years old from living in the same small town, and Gertrude knew his parents and grandparents. He said on both occasions when the deeds were notarized, Haywood drove Gertrude to his insurance office, and he came outside to meet them and notarize the deed. Mr. Uitendaal said Gertrude asked him about his parents and how his family was doing and had a general social conversation. He said she appeared to be "at herself mentally," and he would not have notarized the deeds if he suspected that her mental state was not clear. Mr. Uitendaal said he saw Gertrude sign the deeds on both occasions, and he did not observe any type of coercion.

Haywood's wife, Carolyn, testified as well. Carolyn testified that Bobby was living with his parents when he was 52 or 53 years old, and always drunk, and Calvin and Gertrude asked him to leave. Carolyn said that she and Haywood helped Gertrude in any way that they could. She said that Gertrude took pain pills because she suffered from diabetic neuropathy and her body eventually "began to play out," but "there wasn't anything wrong with her mind." Carolyn said she did not believe that Gertrude suffered from memory loss or dementia. She acknowledged that Gertrude may have suffered from some depression while caring for Calvin when he had Alzheimer's Disease, but she said it later improved.

Carolyn testified that neither she nor Haywood did anything to try to convince Gertrude to deed the property to them. She said she had never observed Haywood trying to tell Gertrude what to do and explained, "You don't tell [Gertrude] what to do. You couldn't tell her what to do." Carolyn testified that an attorney drew up the deeds, but that Gertrude wanted Mr. Uitendaal to notarize the deeds because she knew him. Carolyn said she was in the vehicle with Haywood and Gertrude when they went to Mr. Uitendaal's office to sign the deeds. Carolyn also testified about

the family member's ex-wife going to the bank with Calvin to withdraw money before Haywood set up the Special Account in his name.

The court also heard testimony from Laneta Cozart, the branch manager and assistant vice president of the local bank branch where Gertrude did her banking. Ms. Cozart testified that she had known Gertrude and Calvin since she began working at the bank in 1978. Ms. Cozart testified about a signature card executed by Gertrude on September 21, 2004, which named Haywood as the pay-on-death beneficiary of a checking account. Ms. Cozart testified that she met with Gertrude when she signed the signature card, and Gertrude did not appear to have any type of mental incapacity. Ms. Cozart said, "I talked with her specifically about exactly what we were doing to make sure that she understood the way we were styling the account." Ms. Cozart testified that Haywood was with Gertrude, but she said Gertrude did not appear to be coerced in any way or influenced by him. Ms. Cozart testified that in her dealings with Gertrude over the years, Gertrude always seemed "very strong minded." She said Gertrude "knew what she wanted and would tell me and then we would do it accordingly."[5]

Ms. Cozart also testified that she had observed Calvin coming into the bank prior to his death with the aforementioned ex-wife of a family member. Ms. Cozart testified that she remembered setting up another account styled as a "special account," but she could not recall the circumstances regarding its creation.

The trial court's order contained twenty-nine pages of findings of fact and conclusions of law. The trial court found that Haywood had assisted in the care of both his parents from 1967 until their deaths, while Bobby had not been to his parents' home since 1994 when his parents threw him out. The court specifically found that Bobby told his parents, after Calvin's heart surgery, that he intended to take over their farm and build houses everywhere. The court found that Bobby subsequently went to his parents' house when they were not home to steal a horse trailer. The court found that Bobby did not visit Calvin or Gertrude in the hospital, and it noted the incident when Haywood took Gertrude to Bobby's house and Bobby told him to take her home. The court concluded, "It is obvious from the evidence in this case that the plaintiff, Bobby Thompson, acted in a shameful way towards his parents and had alienated himself from his parents." The court also noted that Bobby did not attend either of his parents' funerals and testified that he simply does not go to funerals. The

---

[5] Ms. Cozart testified that another document had previously been executed on the same checking account, on February 6, 2001, which added Haywood as the pay-on-death beneficiary. However, for some reason, that document was not entered into the bank's computer system in order to add the pay-on-death designation. Ms. Cozart testified that she subsequently questioned Gertrude about the absence of a pay-on-death beneficiary for the account, and she and Gertrude executed the second signature card in 2004 naming Haywood as the beneficiary because "we wanted to make sure that there was a beneficiary on the account."

At trial, Bobby introduced a report from a handwriting expert, which stated that Gertrude's signature on the 2001 signature card was "probably" written by Haywood. However, no one testified about the circumstances surrounding the 2001 signature card's execution. Ms. Cozart said she did not recall the execution of the 2001 signature card, but that she would never knowingly allow someone to forge a document.

court found that "[t]his poor excuse for not attending the funerals of his parents is a true indication of his complete disrespect for his parents while at the same time seeking their property in this case."

The trial court noted Haywood's testimony that the two deeds were prepared because Gertrude wanted his family to have everything and Bobby to have nothing. The court also mentioned Haywood's testimony that Gertrude wanted his family to have everything because she knew they would always take care of her. The court found that Bobby's shameful actions toward Gertrude, in addition to Gertrude and Calvin's isolation from Bobby, supported "a strong inference that Gertrude Thompson wanted Haywood Thompson to have everything to the exclusion of Bobby Thompson."

Regarding Gertrude's mental state, the trial court discussed the testimony from various witnesses about Gertrude being strong-willed and determined even up until the time that she entered the retirement center. The court discussed the fact that Gertrude carried on general social conversations with Mr. Uitendaal prior to executing the two deeds, and Mr. Uitendaal testified that she appeared to be mentally competent on both occasions and not influenced by Haywood. The trial court noted the July 7, 2004 medical record, which stated that Gertrude never got lost driving, and that Gertrude was able to drive herself until August 31, 2004. The court discussed the fact that even after Gertrude's driving privileges were taken away, she still went out to eat a lot, knew the people she met, and carried on normal conversations. The court discussed Ms. Cozart's testimony, whom the court found to be "an unbiased and disinterested witness," that Gertrude was always strong-willed, knew what she wanted, and made her wishes known. The court also discussed her testimony that when she met with Gertrude on September 21, 2004, Gertrude did not appear to have any mental incapacity or be influenced by Haywood, and the fact that Gertrude understood the pay-on-death provision of the account.[6] The court also found that Gertrude "made her own decision" to move to the assisted living facility in January of 2005.

The court quoted the four "Stipulated Issues to be Determined by the Court," which the parties submitted prior to trial. The first two issues involved the undue influence claim regarding the two deeds. The court found that a confidential relationship between Gertrude and Haywood was created upon execution of the power of attorney on January 10, 2002, but the court noted that it found "no clear evidence in this case that Haywood Thompson exercised his right to use the Power of Attorney." Nevertheless, the court found that "[t]he clear and convincing evidence in this case does not support a finding that the free agency of Gertrude Thompson was destroyed and was replaced by the will of Haywood[.]" The court found that Gertrude executed the two deeds "in accordance with her desire to exclude her son, Bobby Thompson, from her estate." The court found that the transactions were "fair and in accordance with the wishes of Gertrude Thompson." The court concluded by stating that "[i]t is the finding of the Court, by clear and convincing evidence[,] that Haywood Thompson did not abuse the confidential relationship that existed between him and his mother, Gertrude Thompson."

_____

[6] The court noted Bobby's insistence that the 2001 signature card, which named Haywood as the pay-on-death beneficiary, was forged by Haywood. However, the court found that Gertrude's execution of the signature card in 2004 naming Haywood as the pay-on-death beneficiary "makes the issue of forgery a moot issue."

Regarding the third issue, the court specifically addressed each one of the thirty-eight checks and withdrawals at issue and found no evidence of fraud, wrongful conversion, or wrongdoing on the part of any of the defendants. The court found that Haywood established the "Special Account" as a separate depository for money that belonged to Gertrude, to be used for her benefit, and that Haywood had submitted a "complete accounting" for the "Special Account" in the voluminous financial documents he submitted at trial.

As for the personal property at issue, the court addressed each of the allegedly converted items and found no evidence of wrongdoing or conversion. Based on these findings, the trial court dismissed the complaint filed by Bobby. Bobby timely filed a notice of appeal.

## II. Issues Presented

On appeal, Bobby asserts that the trial court erred in finding no undue influence. Bobby claims that the trial court misconstrued Tennessee law on undue influence and erred in applying the law to the facts of this case. Specifically, Bobby argues on appeal that Haywood should have been required to prove the fairness of each of the transactions he challenged at trial (i.e., the deeds, the thirty-eight bank account withdrawals, and the personal property dispositions). Because Bobby challenged the deeds on the basis of undue influence, we agree with Bobby's contention that Haywood was required to prove the fairness of these transactions. However, we find that the evidence supports the trial court's conclusion that the deed transactions were fair and not the product of undue influence. As for the remaining transactions involving the thirty-eight withdrawals and the personal property, the "Stipulated Issues to be Determined by the Court" limited the trial court's consideration to whether these transactions were "wrongfully converted" to the use and benefit of Haywood and his family. The trial court found "no evidence of fraud, wrongful conversion or any wrong doing" by the defendants with regard to these transactions. We will review the trial court's conclusion with regard to these transactions, but we decline the invitation to review each of the transactions using an undue influence analysis because the issue was not properly submitted at trial. *See Joyce v. Collins*, No. E2005-01177-COA-R3-CV, 2006 WL 359757, at *7 (Tenn. Ct. App. Feb. 16, 2006) (refusing to consider on appeal whether a deed was executed as the result of undue influence when the plaintiff's complaint only alleged undue influence with regard to a separate transaction).

## III. Standard of Review

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2008); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing

effect. ***Watson v. Watson***, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). When the resolution of issues depends upon the truthfulness of witnesses, the fact-finder, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. ***Mach. Sales Co., Inc. v. Diamondcut Forestry Prods., LLC***, 102 S.W.3d 638, 643 (Tenn. Ct. App. 2002); *see also* ***Bryant v. Baptist Health Sys. Home Care of E. Tenn.***, 213 S.W.3d 743, 750 (Tenn. 2006). The weight, faith, and credit to be given to a witness's testimony lies, in the first instance, with the trier of fact, and the credibility accorded by the trial judge will be given great weight by the appellate court. ***Id.*** "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." ***Wells v. Tenn. Bd. of Regents***, 9 S.W.3d 779, 783 (Tenn. 1999). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV. Discussion

### A. Undue Influence and the Two Deeds

Before the trial court, Bobby contended that the real estate conveyed to Haywood and Carolyn by the deeds executed on September 14, 2003, and January 29, 2004, "was obtained by the Grantees as a result of undue influence exerted upon Gertrude Thompson by the Grantees, thereby rendering the conveyance void so that the real estate would pass under the [will] to her sons[.]"

"Courts apply the doctrine of undue influence 'when one party, such as a grantee, is in a position to exercise undue influence over the mind and the will of another, such as a grantor, due to the existence of a confidential relationship.'" ***In re Estate of Price***, 273 S.W.3d 113, 125 (Tenn. Ct. App. 2008) (quoting *Brown v. Weik*, 725 S.W.2d 938, 945 (Tenn. Ct. App. 1983)). "[A] deed to a grantee who is a confidential relationship with the grantor can be set aside if the grantee has exerted undue influence on the grantor to procure the deed." ***In re Conservatorship of Groves***, 109 S.W.3d 317, 351 (Tenn. Ct. App. 2003) (citing *Brown*, 725 S.W.2d at 945). The underlying theory of the doctrine of undue influence is that the donor was induced by various means to execute an instrument that, in reality, was the will of another substituted for that of the donor. ***DeLapp v. Pratt***, 152 S.W.3d 530, 542 (Tenn. Ct. App. 2004). Undue influence "consists of exerting enough influence or pressure to break down a person's will power and to overcome a person's free agency or free will so that the person is unable to keep from doing what he or she would not otherwise have done." ***Rawlings v. John Hancock Mut. Life Ins. Co.***, 78 S.W.3d 291, 301 (Tenn. Ct. App. 2001) (citing *Bills v. Lindsay*, 909 S.W.2d 434, 440 (Tenn. Ct. App. 1993); *Hollis v. Thomas*, 303 S.W.2d 751, 758 (Tenn. Ct. App. 1957)). "Courts should exercise the utmost care and caution before concluding that the solemn act of a decedent, such as execution of a deed or will, should be invalidated; but, it is equally important that they be vigilant to prevent imposition upon those who are weak, frail, and

-11-

vulnerable to the influence and importunities of others who exercise a dominant position over them." ***Richmond v. Christian***, 555 S.W.2d 105, 109 (Tenn. 1977).

In Tennessee, where there is a confidential relationship between parties, followed by a transaction wherein the dominant party receives a benefit from the other party, a presumption of undue influence arises that may only be rebutted by clear and convincing evidence of the fairness of the transaction. ***Childress v. Currie***, 74 S.W.3d 324, 328 (Tenn. 2002) (citing *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995)). A confidential relationship is any relationship that gives one person dominion and control over another. ***Id.*** There are two sources of confidential relationships: (1) legal confidential relationships, and (2) family and other relationships. ***In re Estate of Brevard***, 213 S.W.3d 298, 302 (Tenn. Ct. App. 2006) (citing *Matlock*, 902 S.W.2d at 385-86). A normal family relationship between a parent and an adult child, standing alone, does not give rise to a confidential relationship. ***In re Estate of Price***, 273 S.W.3d at 125 (citing *Iacometti v. Frassinelli*, 494 S.W.2d 496, 499 (Tenn. Ct. App. 1973)). Family and other relationships are not considered confidential relationships unless there is proof of domination and control. ***In re Estate of Brevard***, 213 S.W.3d at 303. In that situation, the issue of whether a confidential relationship arose is a question of fact. ***Id.*** Legal confidential relationships, on the other hand, are confidential *per se* because of the legal status of the parties. ***Id.*** (citing *Kelley v. Johns*, 96 S.W.3d 189, 195 (Tenn. Ct. App. 2002)). For example, a confidential relationship arises as a matter of law when the dominant party has been granted an unrestricted power of attorney. ***Childress***, 74 S.W.3d at 328-29 (citing *Matlock*, 902 S.W.2d at 386). However, when an unrestricted power of attorney has been executed but not yet exercised, a confidential relationship does not automatically arise as a matter of law. ***Id.*** at 330. Good sense dictates that dominion and control do not exist solely because of the existence of an unexercised power of attorney. ***Id.*** at 329.

In this case, the trial court found that "[a] confidential relationship between Gertrude Thompson and her son, Haywood Thompson[,] was created upon execution of the Power of Attorney, although there is no clear evidence in this case that Haywood Thompson ever exercised his right to use the power of attorney." On appeal, the parties dispute whether Haywood actually exercised the power of attorney subsequent to its execution on January 10, 2002. Haywood signed various documents by writing his mother's name and then his name directly beneath it, but he did not specifically indicate that he was exercising his authority as power of attorney. However, we need not address the issue because Haywood's answer to the complaint stated, "it is admitted that the Defendant James Haywood Thompson was a fiduciary through the execution *and use of the power of attorney* executed by his mother Gertrude Thompson[.]" (emphasis added). We are not aware of any point in the trial court proceedings when Haywood disputed the fact that he exercised the power of attorney. Therefore, we find that a confidential relationship existed between Haywood and Gertrude.

"Once a confidential relationship has been shown and a presumption of undue influence arises, the burden shifts to the dominant party to rebut the presumption by proving the fairness of the transaction by clear and convincing evidence." ***Childress***, 74 S.W.3d at 328 (citing *Matlock*, 902 S.W.2d at 386; *Gordon v. Thornton*, 584 S.W.2d 655, 658 (Tenn. Ct. App. 1979)). In other words,

the party trying to rebut the presumption of undue influence must establish by clear and convincing evidence "that the transaction was fair and not procured through undue influence." ***Parish v. Kemp***, No. W2007-02207-COA-R3-CV, 2008 WL 5191291, at \*5 (Tenn. Ct. App. Dec. 11, 2008); *see also* ***In re Estate of Turner***, No. W2004-02123-COA-R3-CV, 2005 WL 2086028, at \*8 (Tenn. Ct. App. Aug. 30, 2005) ("the burden shifts back to the defendants to show the *absence* of undue influence"). The strength of the presumption of undue influence varies with the circumstances of each case, and therefore, "the strength of the rebutting evidence must vary proportionally."[7] ***Richmond***, 555 S.W.2d at 108 (citing *Roberts v. Chase*, 166 S.W.2d 641, 651 (Tenn. Ct. App. 1942)).

"Proof that the donor received independent advice respecting the consequences and advisability of the gift is one example, but not the only one, of such proof of fairness." ***Richmond***, 555 S.W.2d at 107-108. The circumstances surrounding some transactions are such that the only way in which the fiduciary can rebut the presumption of invalidity is to show that his principal had the benefit of independent advice. ***Id.*** at 108 (quoting *Roberts*, 166 S.W.2d at 651). "Independent advice is ordinarily required where it is a reasonable requirement and where the circumstances are such that it would be difficult to show the fairness of the transaction without proof of independent advice, particularly, where the donor is impoverished by the gift in question or the gift seems to be unnatural under the circumstances of the case." ***Id.*** (citations omitted). In such cases, proof of independent advice may be the only way in which it can be shown that the donor was acting independently and with full appreciation of what he was doing. ***Id.*** (citing *Roberts*, 166 S.W.2d at 651). "The question as to whether such independent advice is essential is ordinarily determined with respect to the nature of the confidence reposed, the nature of the transaction and the circumstances in each particular case." ***Id.*** (quoting *Roberts*, 166 S.W.2d at 651). In sum, proof of independent advice becomes indispensable only when the fairness of the transaction cannot be proved clearly and convincingly without it. ***In re Estate of Maddox***, 60 S.W.3d 88, 90 (Tenn. Ct. App. 2001).

---

[7] The presence of suspicious circumstances may warrant the conclusion that the person allegedly influenced did not act freely and independently. ***In re Estate of Maddox***, 60 S.W.3d 84, 88 (Tenn. Ct. App. 2001). Such circumstances often include:

> (1) the existence of a confidential relationship between the testator and the beneficiary;
> (2) the testator's physical or mental deterioration;
> (3) the beneficiary's active involvement in procuring the will;
> (4) secrecy concerning the will's existence;
> (5) the testator's advanced age;
> (6) the lack of independent advice in preparing the will;
> (7) the testator's illiteracy or blindness;
> (8) the unjust or unnatural nature of the will's terms;
> (9) the testator being in an emotionally distraught state;
> (10) discrepancies between the will and the testator's expressed intentions; and
> (11) fraud or duress directed toward the testator.

*Parish*, 2008 WL 5191291, at \*6. There is no certain type or number of suspicious circumstances that must exist to invalidate a transaction. ***Id.*** The issue should be decided by applying sound principles and good sense to the facts of each case. ***Id.***; *see also* ***In re Estate of Maddox***, 60 S.W.3d at 89.

Proof of "fairness" can also be shown by other means. The scope of evidence relevant to the fairness of a transaction or gift is quite broad. *In re Estate of Bean*, No. M2003-02029-COA-R3-CV, 2005 WL 3262936, at *11 (Tenn. Ct. App. Dec. 1, 2005); *In re Estate of Park*, No. M2003-00604-COA-R3-CV, 2005 WL 3059443, at *9 (Tenn. Ct. App. Nov. 14, 2005); *In re Estate of Maddox*, 60 S.W.3d at 89. "The nature of proof of fairness necessary to overcome the presumption of undue influence is, of course, largely dependent on the particular facts of the case at issue." *Taylor v. Taylor*, No. M2007-00565-COA-R3-CV, 2008 WL 1850807, at *4 (Tenn. Ct. App. Apr. 24, 2008) *perm. app. denied* (Tenn. Oct. 27, 2008). The question for us is not whether the weaker party's decision was a good one. *Williamson v. Upchurch*, 768 S.W.2d 265, 270 (Tenn. Ct. App. 1988). In the context of a will contest involving undue influence and the issue of "fairness," the Middle Section of this Court explained:

> It is understandable that judges and lawyers might be confused in this area because the appellate courts have not carefully defined what is meant by the *fairness of the transaction*. Without the term being carefully defined the average jury might assume that it was being asked to find whether the person benefitting from the will deserved what the will provided. That is not the meaning of the term. The jury should not be concerned with the question of whether the testator did right by those who ordinarily would be the objects of the testator's bounty. The jury's function is limited to a determination of the testator's capacity to make a will and whether the provisions in the will were arrived at through the free agency of the testator rather than through the imposition of someone else's will. If the jury finds in favor of the will on these two questions it has found that the transaction was fair.

*Matter of Estate of Depriest*, 733 S.W.2d 74, 78-79 (Tenn. Ct. App. 1986). In undue influence cases, the question is not simply whether the donor knew what he intended to do, "but how this intention was produced, whether it was by abuse of a confidential and fiduciary relation." *Richmond*, 555 S.W.2d at 109 (quoting *Turner v. Leathers*, 232 S.W.2d 269, 271 (Tenn. 1950)). "The inquiry is whether the weaker party's decision was a free and independent one or whether it was induced by the dominant party." *Fritts v. Abbott*, 938 S.W.2d 420, 421 (Tenn. Ct. App. 1996) (citing *Williamson*, 768 S.W.2d at 265). Because the effect of undue influence is to create a disposition contrary to the independent will of the testator or grantor, courts look to whether the disposition is unjust or unnatural, or whether it differs from the grantor's previously expressed intentions. *In re Estate of Brindley*, No. M1999-02224-COA-R3-CV, 2002 WL 1827578, at *20 (Tenn. Ct. App. Aug. 7, 2002) (citations omitted).

Whether a person exercised undue influence over another and whether a transaction was fair are questions of fact. *In re Estate of Price*, 273 S.W.3d at 125; *In re Estate of Turner*, 2005 WL 2086028, at *8; *In re Estate of Brindley*, 2002 WL 1827578, at *20. "The issue of undue influence should 'be decided by the application of sound principles and good sense to the facts of each case.'" *Childress*, 74 S.W.3d at 329 (quoting *Mitchell v. Smith*, 779 S.W.2d 384 (Tenn. Ct. App. 1989)); *In re Estate of Brevard*, 213 S.W.3d at 302.

In the case before us, the issue is not whether it was fair for Haywood and Carolyn to receive the property, as opposed to Bobby. *See, e.g.*, ***Smith v. Smith***, No. E2003-02877-COA-R3-CV, 2004 WL 2378245, at *3 (Tenn. Ct. App. Oct. 25, 2004) (explaining that the test is not whether the transaction was fair to potential beneficiaries); ***Underwood v. Johnson***, No. 1219, 1989 WL 3140, at *4 (Tenn. Ct. App. E.S. Jan. 20, 1989). The question is whether Gertrude acted through her own free agency rather than as a result of undue influence. *See **Richmond***, 555 S.W.2d at 109; ***Matter of Estate of Depriest***, 733 S.W.2d at 78-79; ***Underwood***, 1989 WL 3140, at *4. Considering the totality of the circumstances, we conclude that the evidence does not preponderate against the trial court's finding that Haywood and Carolyn overcame the presumption of undue influence. Admittedly, there were some suspicious circumstances present in this case. However, Haywood and Carolyn presented convincing evidence that Gertrude acted freely and independently in executing the two deeds on September 14, 2003, and January 29, 2004.

Gertrude was living alone and regularly driving herself when the two deeds were executed. She did not suffer from blindness or illiteracy, and she continued to write checks herself. The evidence regarding Gertrude's mental deterioration was conflicting. Some of Gertrude's medical records indicated that she experienced decreased recent memory and dementia, but others made no mention of memory problems, and the July 7, 2004 medical record stated that she "continues to do remarkably well – her memory loss has <u>not</u> progressed – she still drives her own car – she never gets lost, etc." Bobby testified that Gertrude "was still driving around and doing everything. Nothing was wrong with her, just her mind was off." However, all of the other witnesses testified that Gertrude was not suffering from mental issues. Gertrude was described as strong-willed, very strong-minded, independent, having "a mind of her own," hard-headed, and very determined. She was also described as a woman who "never did ask nobody for help," who knew what she wanted to do, did everything she wanted to do, and did nothing she did not want to do. One witness said, "when she made her mind up, . . . that's the way it was going to be."

Haywood was actively involved in the execution of the deeds, in that he contacted the attorney who prepared the deeds, and he drove Gertrude to Mr. Uitendaal's office to have them notarized. However, Gertrude chose to have Mr. Uitendaal notarize the deeds because she knew him. Mr. Uitendaal observed Gertrude personally executing the deeds on both occasions. He had a social conversation with Gertrude at both meetings, and he did not observe anything during either transaction that raised a question in his mind as to mental issues or undue influence. There was no suggestion that Gertrude was mentally distraught or under any type of fraud or duress. Haywood's wife testified that neither she nor Haywood did anything to try to convince Gertrude to deed the property to them. In fact, Carolyn said she had never observed Haywood trying to tell Gertrude what to do and explained, "You don't tell [Gertrude] what to do. You couldn't tell her what to do." Haywood testified that Gertrude instructed him to "get everything fixed" so that he and his family would have everything when she died because she knew he would take care of her for the rest of her life. Neither of the deeds was kept secret. Although it appears that no one told Bobby about the deeds, this was not unusual based on the fact that Bobby was alienated from the family. Bobby and Haywood's first cousin testified that he had several conversations with Gertrude about how she had her affairs in order, but he was not allowed to testify as to the specific details of their conversations.

In addition, both deeds were recorded shortly after their respective dates of execution. Thus, as a matter of public record, the deeds were not shrouded in secrecy. *See Estate of Fisher ex rel. Meyers v. Rogers*, No. W2001-02506-COA-R3-CV, 2002 WL 31895721, at *4 (Tenn. Ct. App. Dec. 31, 2002).

Although there was no evidence that Gertrude received independent advice regarding the execution of the two deeds, based on the facts and circumstances of this case, we conclude that the presumption of invalidity of these deeds is not so strong as to absolutely require proof of independent advice in order to prove the transactions were fair. "[T]he strength of the presumption of invalidity varies with the circumstances of each case and, therefore, . . . the strength of the rebutting evidence must vary proportionally." *Richmond v. Christian*, 555 S.W.2d 105, 108 (Tenn. 1977). Gertrude did not receive any consideration for the conveyances, but she did not become impoverished. On September 14, 2003, when the first deed was executed, Gertrude had approximately $5,800 in her own checking account and had access to over $26,500 being held for her benefit in the Special Account. Haywood routinely paid Gertrude's bills from the Special Account and withdrew money in cash from the account for Gertrude as needed. Gertrude's monthly social security income was being deposited in her checking account. She was living in her own house on sixteen acres with her own personal property. When the second deed was executed on January 29, 2004, Gertrude had $3,700 in her own checking account and $26,000 in the Special Account being held for her benefit. She maintained her social security income and personal property and continued to live in her house until September 1, 2004, when she decided to move in with Haywood and Carolyn. Throughout the period in question, Gertrude continued to drive an estimated 100 miles per day visiting friends and family, and she dined out with friends and family several times a week. There was no evidence presented to suggest that she ever struggled financially.

In addition, we do not consider the two deeds to have been unnatural gifts in light of the circumstances in this case. Although Gertrude's 1978 will left all of her estate to Calvin, and if he predeceased her, to both sons, the family's situation had clearly changed since 1978. Haywood had worked on his parents' farm since 1967, and his family did everything they could to take care of Gertrude. Bobby, on the other hand, had not visited Gertrude in eleven years.[8] Also, we note that Haywood did not dissuade his mother from maintaining a relationship with Bobby or attempt to keep her isolated from him. Haywood took Gertrude to Bobby's house to visit, and Bobby told them to leave.

There was no direct evidence that Haywood or anyone else undertook to influence Gertrude's decisions regarding the disposition of her property. Gertrude's actions with respect to the deeds were consistent with how she disposed of the rest of her assets. Haywood was named as the pay-on-death beneficiary of most of Gertrude's financial accounts many years ago, and Gertrude confirmed her decision to name Haywood as the beneficiary of one account as recently as September of 2004. The fact that Gertrude's decisions seemed unfair to Bobby, in his mind, is irrelevant.

---

[8] Although Bobby testified to the contrary, the trial judge did not believe Bobby's testimony and made specific findings regarding his behavior. We will not second-guess the trial court's credibility determination.

In sum, we find that the evidence supports the trial court's conclusion that the conveyances were "fair and in accordance with the wishes of Gertrude Thompson" and "her desire to exclude her son, Bobby Thompson, from her estate." We affirm the trial court's finding that the deeds were not the product of undue influence.

### B.    The Financial Transactions

In the next issue presented to the trial court, Bobby questioned "Whether or not any of the amounts of money identified on Exhibit 'A' to this instrument . . . were obtained by Haywood Thompson and wrongfully converted to his use and benefit so that a judgment should be entered against Haywood Thompson in favor of the Estate of Gertrude Thompson for any such amount."

In Tennessee, conversion is the appropriation of tangible property to a party's own use and benefit in exclusion or defiance of the owner's rights. *H & M Enters., Inc. v. Murray*, No. M1999-02073-COA-R3-CV, 2002 WL 598556, at *3 (Tenn. Ct. App. Apr. 17, 2002) (citing *Barger v. Webb*, 391 S.W.2d 664, 665 (Tenn. 1965); *Lance Prods., Inc. v. Commerce Union Bank*, 764 S.W.2d 207, 211 (Tenn. Ct. App. 1988)). "Conversion is an intentional tort, and a party seeking to make out a prima facie case of conversion must prove (1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights." *Id.* (citing *Kinnard v. Shoney's, Inc.*, 100 F. Supp. 2d 781, 797 (M.D. Tenn. 2000); *Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977)). To constitute conversion, the defendant must intend to convert the plaintiff's property. *Gen. Elec. Credit Corp. of Tenn. v. Kelly & Dearing Aviation*, 765 S.W.2d 750, 753 (Tenn. Ct. App. 1988). However, "[t]his intention does not necessarily have to be a matter of conscious wrongdoing, but can merely be an exercise of dominion or control over the property in such a way that would be inconsistent with the owner's rights and which results in injury to him." *Id.* In other words, "the defendant need only have an intent to exercise dominion and control over the property that is in fact inconsistent with the plaintiff's rights, and do so; good faith is generally immaterial." *Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977). It is the degree of interference with the property, as well as the duration of that interference, that will be determinative of whether there has been conversion. *Gen. Elec. Credit Corp.*, 765 S.W.2d at 753-54.

Bobby challenged thirty-eight withdrawals from various accounts owned, at least in part, by Gertrude that were made between 1998 and 2004. The challenged withdrawals ranged from $100 to $12,470. Haywood and Ms. Cozart testified about a few of the transactions, but the bulk of the evidence regarding the transactions is located in several binders full of account statements and documents. The trial court specifically listed and discussed each of the thirty-eight withdrawals at issue in its final order and found, with respect to each one, "no evidence of fraud, wrongful conversion or any wrong doing" by the defendants. Rather than specifically addressing each of the transactions, we will discuss them in groups where possible.

### 1.    Money Deposited into Savings Account -696

The first transaction at issue was a withdrawal of $3,723.49, made on April 27, 1998, from checking account number -322. At the time of this withdrawal, the names listed on checking account number -322 were Calvin Thompson and Mrs. Calvin Thompson. The withdrawal slip for this transaction states "Transfer to S/A," and Calvin Thompson's name is written on the slip. Thus, it appears that this transaction was completed by Calvin. On the same day of this withdrawal, the records from Calvin and Gertrude's savings account number -696 indicate that $3,723.49 was deposited into the savings account. There is no evidence that Haywood converted this money, as it does not appear that he was even involved in the transaction, and the money was deposited into his parents' savings account.

### 2. Money Deposited into Checking Account -322

Beginning with the July 28, 1998 statement for checking account number -322, the names listed on the account were Calvin Thompson, Gertrude Thompson, and Haywood Thompson. Beginning on April 1, 1999, Haywood's name was also added to his parents' savings account, number -696. Between January and February of 2001, Calvin's name was removed from checking account number -322 and savings account number -696.

Bobby challenges seven withdrawals made from the savings account between June 4, 1999, and December 19, 2001. However, on the same day that each of these withdrawals were made from the savings account, deposits of the amount of money withdrawn were made to checking account number -322. In other words, the records show that the money was simply withdrawn from the savings account and placed into the checking account. Gertrude's name was on both of these accounts, and we find nothing to suggest that Haywood converted the funds. There is no evidence in the record as to who made the first six withdrawals and deposits. On the seventh transaction, Haywood signed the checking account deposit slip with his name and Gertrude's name, and he wrote a check from the account two days later for the same amount of the deposit with a notation on the check for "pre-need burial expenses." Calvin died approximately six months later. We find no evidence of conversion with regard to these seven transactions.

### 3. Two Checks to Haywood

Next, Bobby challenges two $10,000 withdrawals from the checking account. The bank records show that on December 29, 2001, Gertrude wrote a check to Haywood for $10,000. On January 2, 2002, Gertrude wrote a second check to Haywood for $10,000. Haywood testified that his mother gave him this money as gifts. A handwriting expert confirmed that these checks were in fact written by Gertrude. Haywood's name was listed on the checking account at the time, and he could have simply withdrawn money from the account. The records show that Haywood deposited these two checks into the "Special Account," which he used for Gertrude's benefit. The deposit slip from the transaction lists "Gift for 2001" beside the first $10,000 deposit, and "Gift for 2002" beside the second $10,000 deposit. Haywood testified even though he received the money as gifts, he put the money in the Special Account so that if Gertrude needed it, she would have it. We find no evidence that Haywood wrongfully converted these funds.

## 4.     Withdrawals in January of 2002

Next, Bobby challenges several transactions that took place in early January of 2002.  Four certificate of deposit accounts, worth $5,011.21, $4,046.63, $7,035.92, and $5,050.63, were closed, and the money was deposited directly into checking account number -322.

Also in January, Gertrude's savings IRA account worth $2,335.39 was closed, a withdrawal of $1,036.36 was made from savings account number -696, the remaining balance of $2,662.24 in checking account number -322 was withdrawn,[9] and two more certificate of deposit accounts, worth $12,470.52 and $5,570.45, were closed.  All of this money was deposited into the Special Account on January 10, 2002.  The deposit slip in the record lists each of the five sums deposited and the account numbers of the accounts from which they were withdrawn, for a total deposit of $24,074.96 to the Special Account.[10]

At trial, Haywood submitted records from his computer software providing a complete accounting of all transactions involving the Special Account, beginning in January of 2002.  These records show that Haywood paid Gertrude's bills from the Special Account.  The trial court found that the Special Account was "for the use and benefit of [Gertrude].  Bobby only points to one transaction prior to Gertrude's death as not benefitting Gertrude, which was a $920.75 check to the Co-op for lime for use on the farm.  Considering the two $10,000 checks that Haywood deposited into the Special Account, we find no wrongdoing based on this one expense.  In addition, we agree with the trial court's finding that this account was used for the benefit of Gertrude. Therefore, Haywood did not convert the funds he withdrew and deposited into the Special Account.

## 5.     Withdrawals for Cash

Next, Bobby challenges thirteen withdrawals from savings account number -696 and checking account number -330[11] made between March 14, 2002, and September 24, 2004.  Some of these withdrawals were made by Haywood, while others were made by checks payable to the bank, which appear to have been written by Gertrude.  According to Haywood, he kept money on hand and gave it to Gertrude in cash whenever she needed it.  Bobby testified when he was growing up, his mother always wrote checks for purchases and did not carry large amounts of cash.  However, the record contains many other checks, not challenged by Bobby, which were written to the bank by Gertrude with notations that they were for "Cash."  The handwriting expert confirmed an exemplar of such checks as having been written by Gertrude.

---

[9]  The balance remaining in checking account number -322 was reduced because of the two gifts to Haywood and the $12,000 check for pre-need burial services.

[10]  We note that on all of the accounts closed in January of 2002, except one, Haywood's name was either listed on the account with Gertrude's name or he was listed as the pay-on-death beneficiary of the account.

[11]  This was the checking account that Gertrude continued to use after the Special Account was opened.

-19-

The trial judge clearly believed Haywood's testimony that he gave the money to Gertrude in cash. The court found that the average amount of cash withdrawn from the accounts each month, including cash withdrawals by Haywood and checks written by Gertrude for cash, was $260 per month. The court concluded, "The record shows that Gertrude Thompson often dined out at local restaurants and liked to go places in her automobile. The Court finds that the cash withdrawn for the use and benefit of Gertrude Thompson was not an unreasonable amount of money for her miscellaneous cash expenditures." We agree and find no evidence that Haywood converted the money.

### 6. Miscellaneous Checks

Finally, Bobby challenges six checks that were written between 1998 and 2003 from the two checking accounts. One check was written to Wal-mart, and the trial court found that it was written for purchases by Gertrude. The second check, written in 1998, was payable to an individual, with a notation that it was for roof and carport repairs. The trial court found that this check was for repairs to Calvin and Gertrude's house. The third check was payable to a car dealer, and the trial court found that it was used to purchase Gertrude's 1990 Plymouth vehicle. The last three checks were written to an insurance company. On two of those, Haywood signed Calvin's name and then his name on the check, and the trial court found that the checks were written for farm insurance. On the third insurance check, Haywood signed Gertrude's name and then his name, and the trial court found that the check was written for automobile and homeowner's insurance. With regard to all six checks, the trial court found no evidence of wrongdoing or conversion. We affirm the trial court's findings, as Bobby does not point to any contrary evidence on appeal.

### C. The Personal Property

In Bobby's final issue, he asked the trial court to determine "[w]hether or not any farm related machinery or equipment, automobile, necklace, or ring owned by Gertrude Thompson was obtained by any of the Defendants and wrongfully converted to the use and benefit of any such Defendant[.]" The trial court found that Bobby failed to present any evidence that any of the defendants wrongfully converted any farm related machinery or equipment owned by Gertrude. Bobby submitted interrogatories to the defendants regarding the location of various items of farm equipment, and according to the defendants' answers, Mike Thompson purchased Calvin's tractor in 1992 for $5,000, and he purchased two pieces of farm equipment from Gertrude in 2001. Mike also testified about these transactions. The defendants' answers to interrogatories also stated that Calvin sold other items of his farm equipment at a farm sale. As for the automobile, the trial court found it undisputed based on the record that Gertrude gave her 1990 Plymouth to her granddaughter for the benefit of Gertrude's sixteen-year-old great-granddaughter. Finally, the trial court found that Bobby offered no evidence to show that any of the defendants wrongfully converted a necklace or ring owned by Gertrude. Bobby does not point to any error in the trial court's factual findings, and we find none. Therefore, we affirm the trial court's finding that no conversion occurred with respect to the personal property at issue.

## V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the circuit court. Costs of this appeal are taxed to the appellant, Bobby Thompson, and his surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.